**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| CHRISTIAN VALLEJO, *Individually and on behalf of all similarly situated current and former employees,* § § § § | |
| Plaintiff, § § | |
| VS. § § | CIVIL ACTION NO. H-12-0555 |
| GARDA CL SOUTHWEST, INC., § § § | |
| Defendant. § | |

**MEMORANDUM AND ORDER**

Christian Vallejo sued his former employer, Garda CL Southwest, Inc. (Garda), under the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201–19. Vallejo alleged that Garda violated the FLSA's overtime compensation requirements. (Docket Entry No. 16). Vallejo sued on behalf of himself and other similarly situated employees. On October 18, 2012, three other Garda employees—Artemio Caballero, Karlnetta Coleman, and Jason Winn—filed opt-in notices and then moved to intervene. (Docket Entry Nos. 19–21, 32). After that motion was filed, this court granted Garda's motion to compel Vallejo to arbitrate and dismissed the claims he asserted in favor of arbitration. The order was based on a finding that Vallejo had signed a collective-bargaining agreement between Garda and the employees' union. The agreement included a broad arbitration provision. (Docket Entry No. 36).

The court granted the intervenors' motion to intervene and concluded that their claims were not subject to the arbitration provision in the collective-bargaining agreement because there was no evidence that they had signed the agreement. (Docket Entry No. 45). Garda then moved to stay the

litigation of the intervenors' claims pending the arbitration of Vallejo's claims and Garda's appeal of this court's decision denying the motion to compel arbitration of the intervenors' claims. (Docket Entry No. 52).

Based on a careful review of the motions, responses, and replies; the parties' submissions; and the applicable law, this court denies Garda's motion to stay. A status and scheduling conference is scheduled for December 10, 2013, at 8:30 a.m., in Courtroom 11-B.

The reasons for denying the motion to stay are set out in detail below.

**I.     Background**

The relevant background is set out in the memoranda and orders of January 30, 2013 and June 4, 2013, (Docket Entry Nos. 36, 45), and only summarized here. Briefly, Vallejo worked as an armored-car driver and guard for Garda in Houston, Texas from July 2008 until Garda terminated his employment on January 26, 2012. Vallejo was a member of the Houston/North Houston Drivers Association, which Garda alleges is the employees' union for Garda armored-car personnel. Vallejo signed the collective-bargaining agreement between the union and Garda. The agreement, which Vallejo signed on October 21, 2011, stated that the union would be the exclusive representative for collective-bargaining purposes. The agreement also contained an arbitration clause covering "grievances," which were defined in relevant part as:

> a legitimate controversy, claim or dispute by any employee, shop steward or the Union concerning rates of pay, entitlement to compensation, benefits, hours, or working conditions set forth herein . . . . any claim under any federal, state or local law, statute or regulation or under any common law theory whether residing in contract, tort or equity or any other claim related to the employment relationship.

(Docket Entry No. 15, Ex. A, Collective-Bargaining Agreement, Art. 5(a)).

In this lawsuit, Vallejo claimed that he and other employees were entitled to overtime pay

under the FLSA. Vallejo filed suit without submitting the claim to Garda or to arbitration, asking the court to certify a collective action and issue notice. Vallejo defined the proposed class as:

> [a]ll individuals who were employed or are currently employed by one or more of the following: Defendant, its subsidiaries or affiliated companies as armored transport employees or in any other similarly titled position at any time during the relevant statute of limitations period.

(Docket Entry No. 16, at ¶ 32). In addition to his FLSA claim, Vallejo asserted state-law claims for fraud, fraudulent inducement, negligence, and negligent misrepresentation on the theory that Garda itself created the employees' association as a fraudulent or fictitious union. (*Id.* at ¶¶ 50–67).

Garda moved to dismiss or in the alternative to stay the litigation and to compel arbitration of Vallejo's claims. (Docket Entry No. 15). Garda also moved to stay discovery and other deadlines until the court ruled on the motion to dismiss or compel arbitration. (Docket Entry No. 17). While those motions were pending, Garda employees Caballero, Coleman, and Winn filed opt-in notices and then moved to intervene in the FLSA case against Garda. (Docket Entries No. 19–21, 32). Winn had worked as a driver, messenger, and guard at Garda's Houston facility until his employment was terminated on September 14, 2010. Coleman worked for Garda from January 17, 2011 to January 31, 2012, also as a driver, messenger and guard at the Houston facility. Caballero began working for Garda on June 7, 2010 as a driver and messenger at the Houston facility.

While Garda had shown that Vallejo signed the collective-bargaining agreement containing the arbitration agreement, there was no evidence showing that Winn, Coleman, or Caballero signed it. (Docket Entry No. 45, at 14). Vallejo opposed Garda's motion to dismiss or to compel arbitration and moved to divide the class into two subclasses. (Docket Entry Nos. 22, 23). One subclass would include employees like Vallejo who signed the collective-bargaining agreement.

The other subclass would include employees like Winn, Coleman, and Caballero, who had not signed the agreement. Garda replied in support of its motion to dismiss or to compel arbitration. (Docket Entry No. 25). After a hearing on the motions, the parties filed supplemental briefs addressing whether (1) "all of Vallejo's claims were arbitrable, or only those that arose after the effective date of the collective-bargaining agreement," and (2) "whether the suit should be dismissed as to Winn, Coleman, and Caballero, or whether they should be allowed to intervene as named plaintiffs." (Docket Entry No. 36, at 6).

On January 30, 2013, this court granted in part and denied in part Garda's motion to dismiss, compelling arbitration of Vallejo's claims. (Docket Entry No. 36). This court granted Caballero, Coleman, and Winn's motion to intervene, finding that they satisfied the requirements for permissive intervention under Federal Rule of Civil Procedure 24(b). (*Id.*). On March 8, 2013, Garda moved to dismiss or stay the litigation and to compel arbitration as to the three intervenors. (Docket Entry No. 39). On June 4, 2013, the court issued a memorandum and order denying the motion because Garda did not show that "the intervenors consented to arbitration or were otherwise bound by the arbitration clause." (Docket Entry No. 45, at 14). On June 21, 2013, Garda filed a Notice of Appeal of this order. (Docket Entry No. 48). Garda then moved to stay the litigation of the intervenors' claims pending the resolution of Vallejo's arbitration as well as its appeal of this court's order denying the motion to compel arbitration of the intervenors' claims. (Docket Entry No. 52). Garda contends that the intervenors' claims are subject to the Federal Arbitration Act's (FAA) mandatory stay provision, 9 U.S.C. § 3. Garda alternatively argues that a discretionary stay is appropriate under the court's inherent authority to control its docket. *See Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 243 (5th Cir. 2009). The intervenors responded, and Garda replied. (Docket Entry Nos. 53,

54). Garda's motion to stay and the intervenors' response are analyzed below.

**II.     Analysis**

    **A.     The Motion to Stay the Litigation of the Intervenors' Claims Pending the Arbitration of Vallejo's Claims**

The issues presented are whether, and when, a court may use § 3 of the FAA to stay the litigation of claims brought by plaintiffs who did not sign an arbitration clause against a defendant who did sign it. A court must stay litigation of "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. If a mandatory stay is not available under § 3, a court may nonetheless exercise its discretion to stay litigation when it involves issues closely related to those subject to arbitration, as a means of controlling and managing the docket and to preserve the purpose of the arbitration. *See Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)).

        **1.     A Mandatory Stay**

The Fifth Circuit has stated that the FAA's mandatory stay provision generally does not apply to those who did not sign an arbitration agreement and are not otherwise bound by it. *Adams v. Ga. Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001). More recent cases have "muddied" the "clarity of this rule." *Id.* at 540–51. A nonsignatory may obtain a mandatory stay under § 3 if the following circumstances are present: "(1) the arbitrated and litigated disputes must involve the same operative facts; (2) the claims asserted in the arbitration and litigation must be 'inherently inseparable'; and (3) the litigation must have a 'critical impact' on the arbitration." *Waste Mgmt., Inc. v. Residuos Industriales Multiquam*, 372 F.3d 339, 343 (5th Cir. 2004). The Fifth Circuit has applied this framework to allow a nonsignatory to invoke § 3's mandatory stay provision against a

signatory. The cases generally involve disputes between a signatory on the one hand and at least one other party who was a signatory to the arbitration agreement on the other, as well as parties who were nonsignatories. In these cases, the claims asserted in litigation were the same claims that were also subject to arbitration. There was "fundamentally" only "one dispute." *Id.* at 345. As a result, proceeding with the litigation before the arbitration was complete could frustrate or interfere with the arbitration. *Id.* These cases emphasize the difference between a nonsignatory invoking an arbitration clause against a signatory, and a signatory invoking arbitration against one who neither signed nor was otherwise bound by the agreement.

In *Subway Equipment Leasing Corporation v. Forte*, 169 F.3d 324 (5th Cir. 1999), a franchise agreement between Sims, a Subway franchisee, and the parent company of Subway, DAI, contained broad arbitration clauses requiring arbitration of all disputes between Sims and DAI arising out of the franchise relationship. *Id.* at 325. When a dispute arose, Sims pursued arbitration against DAI. *Id.* Sims later sued affiliates of DAI in district court, asserting claims "based entirely" on the franchise agreement. *Id.* at 329. The court concluded that staying the litigation of Sims's claims against the affiliates was necessary to protect DAI's right to arbitrate its dispute with Sims. *Id.* If Sims prevailed in his litigation against the affiliates while the arbitration against DAI continued, the arbitration would be moot because Sims would have recovered all the relief he sought. That would deprive DAI of its contractual right to resolve its dispute with Sims through arbitration.

In *Harvey v. Joyce*, 199 F.3d 790 (5th Cir. 2000), three business partners purchased a company, CTC, and agreed to arbitrate all disputes concerning CTC. *Id.* at 792. The partners' business relationships eventually soured. *Id.* Two partners sued the third and CTC. *Id.* The

arbitration agreement covered the two partners' claims against the third, but not against CTC. The court compelled arbitration of the claims against the third partner. *Id.* at 794. The claims against CTC derived from the claims against the partner. *Id.* at 795. Because the claims against the partner were subject to arbitration and the claim against CTC was identical to the arbitrable claims, "the arbitration proceedings would be both redundant and meaningless . . . [and] thwart[] the federal policy in favor of arbitration" if litigation was not stayed. *Id.* at 796. The court granted a mandatory stay under § 3. *Id.*

The Fifth Circuit similarly held in *Hill v. General Electric Power Systems, Inc.*, 282 F.3d 343 (5th Cir. 2002), that a defendant-nonsignatory was entitled to a mandatory stay of litigation under § 3 when a plaintiff-signatory asserted claims against it that were identical to claims the plaintiff-signatory was arbitrating with another party. In *Hill*, an energy company signed a memorandum of understanding with General Electric Power Systems, Inc. to develop two power plants and a gas storage facility. *Id.* at 345–46. The energy company later terminated this arrangement through an agreement containing an arbitration clause. *Id.* General Electric Capital Corporation (GECC) had entered into a separate agreement without an arbitration clause with the same energy company, under which GECC would serve as the financial advisor to the project. The energy company brought identical claims against both General Electric Power Systems and GECC, alleging that they had conspired to withhold payments, stall financing, withhold information, and force the energy company to use certain equipment. *Id.* at 346. The district court granted General Electric Power Systems's motion to stay and compel arbitration, but denied GECC's motion seeking the same relief because it was not a signatory to the agreement containing the arbitration clause. *Id.* at 346. The Fifth Circuit reversed the denial of GECC's motion to stay. *Id.* at 349. GECC was entitled to a

mandatory stay under § 3 because the claims against GECC were "inherently inseparable" from the claims against General Electric Power Systems and permitting the suit "to go forward would undermine the arbitration proceedings." *Id.* at 348.

In *Waste Management*, a signatory to an arbitration agreement filed a lawsuit seeking contract damages from a company that was a nonsignatory to the agreement. 372 F.3d at 340. The plaintiff-signatory was simultaneously engaged in arbitration with the parent company of the defendant-nonsignatory over the same contract damages at issue in the lawsuit. *Id.* at 340–41. A stay under § 3 was mandatory because the plaintiff-signatory's claims in the litigation were fundamentally the same claims as those asserted in the arbitration: who, if anyone, should reimburse the plaintiff-signatory for the contract damages. *Id.* at 345. Applying the three factors noted above, the court first found that the major operative facts underlying the plaintiff-signatory's claims against the defendant-nonsignatory in the litigation were identical to those underlying the plaintiff-signatory's claims in the arbitration. *Id.* Second, the plaintiff-signatory's claims in the arbitration and the litigation were inseparable because they sought to recover the same payment for a single alleged harm. *Id.* Third and finally, allowing the litigation to proceed would "substantially impact" the arbitration because the arbitrator would be reluctant to reach a decision contrary to the district court's determination. *Id.*

None of these cases involved the circumstances present here, in which a defendant that is bound by an arbitration agreement moved to stay the claims of plaintiffs who did not sign the agreement. The Third Circuit addressed a similar set of facts in *Mendez v. Puerto Rican International Companies, Inc.*, 553 F.3d 709 (3d Cir. 2009), holding that a defendant-signatory could not invoke § 3's mandatory stay provision against a plaintiff-nonsignatory. *Id.* at 711. In

8

*Mendez*, 49 plaintiffs brought discrimination claims against their employer. *Id.* at 710. The employer moved to compel arbitration but could not show that all the plaintiffs had signed arbitration agreements covering the discrimination claims. The district court denied the motion to compel arbitration as to the nonsignatory employees. *Id*. The employer then moved to stay the litigation of their claims pending the arbitration of the claims brought by the signatory plaintiffs. The Third Circuit held that the employer could not invoke § 3's mandatory stay provision against the nonsignatories. *Id*. at 711. The court reasoned that the FAA "was not intended to mandate curtailment of the litigation rights of anyone who has not agreed to arbitrate any of the issues before the court." *Id.*

Both the text and purpose of the FAA support the Third Circuit's conclusion. Section 3's mandatory stay provision applies to "any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. "Arbitration is a matter of contract; a party cannot be required to submit to arbitration unless it agreed in advance that the dispute would be arbitrated." *Smith v. Transp. Workers Union of Am., AFL-CIO Air Transp. Local 556*, 374 F.3d 372, 374 (5th Cir. 2004). A nonsignatory may also be bound by the arbitration agreement under ordinary contract and agency principles. *See Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 361 (5th Cir. 2003) (recognizing that courts may use agency and contract principles to compel arbitration as to a nonsignatory).

The intervenors in this case did not sign the agreement containing the arbitration clause and Garda did not show any other basis to bind them to it. The intervenors' FLSA claims against Garda are not "referable to arbitration." (*See* Docket Entry No. 45, at 14 (denying Garda's motion to compel arbitration of the intervenors' claims because Garda did not show "that the intervenors consented to arbitration or are otherwise bound by the arbitration clause.")).

9

"The overarching purpose of the FAA, evident in the text of §§ 2, 3, and 4, is to ensure the enforcement of arbitration agreements according to their terms . . . ." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011). The § 3 mandatory stay provision furthers this purpose by preventing a party from litigating a claim that it has agreed to, or is otherwise bound to, arbitrate. This typically arises when a plaintiff sues a defendant over a claim subject to the parties' arbitration agreement. *See Mendez*, 553 F.3d at 712 ("Section 3 is drafted to fit the paradigm situation in which a motion for a stay pending arbitration occurs—a plaintiff brings suit on a claim involving an issue it is obligated to arbitrate under an agreement in writing with a defendant and that defendant seeks to stay the litigation pending arbitration."). If the plaintiffs were able to litigate a claim that was subject to arbitration, "the arbitration proceedings would be both redundant and meaningless . . . [and] thwart[] the federal policy in favor of arbitration." *Harvey*, 199 F.3d at 796.

The risk that litigation between a signatory and a nonsignatory would undermine the signatory's agreement to arbitrate was central to the Fifth Circuit's decisions in *Subway*, *Harvey*, and *Waste Management*. In *Subway*, the claims Sims asserted against DAI's affiliates were for the same franchise-agreement breaches Sims and DAI were arbitrating. 169 F.3d at 329. In *Harvey*, the partners' claims against CTC derived from the claims they were arbitrating against a third partner. In *Waste Management*, the plaintiff-signatory sued the subsidiary seeking the same contract damages asserted against the parent company in arbitration. 372 F.3d at 345. A stay was necessary because arbitration with the parent company would have been meaningless had the plaintiff-signatory first obtained relief in the litigation against the subsidiary.

By contrast, litigation between a plaintiff-nonsignatory and a defendant-signatory does not undermine the defendant's right to arbitration when the plaintiff's claims are separate from the

10

claims being arbitrated, even if the subject matter of the claims is similar. And allowing a defendant-signatory to invoke the FAA's mandatory stay against a plaintiff-nonsignatory creates the possibility that the plaintiff-nonsignatory's ability to assert its claims will be delayed "depending on the fortuity of whether there happens to be other parties . . . [that] have agreed to arbitrate a different claim." *Mendez*, 553 F.3d at 712.

Applying the *Waste Management* factors, Garda is not entitled to a mandatory stay. Under the first *Waste Management* factor, the court examines whether the disputes being arbitrated and litigated involve the same operative facts. 372 F.3d at 343. The intervenors' complaint states that their FLSA claims share the same facts that are at issue in Vallejo's arbitration. (*See* Docket Entry No. 33, at ¶ 11). The intervenors note that Vallejo also asserted various state-law claims for fraud and negligence as part of his allegations that Garda created a false and fictitious union. (Docket Entry No. 16, at ¶¶ 50–67). The FLSA claims, however, rest on the same liability facts. This weighs in favor of a stay under the first *Waste Management* factor.

The second *Waste Managment* factor considers whether the claims asserted in the arbitration and litigation are inherently inseparable. 372 F.3d at 343. Garda contends that the claims of Vallejo and the intervenors are inherently inseparable because the same evidence will be presented in the Vallejo arbitration as in the litigation. (Docket Entry No. 52, at 4). Garda's argument appears to conflate the first and second *Waste Management* factors. Claims are inherently inseparable when they involve "fundamentally . . . one dispute." *Waste Mgmt.*, 372 F.3d at 345. In *Waste Management*, the plaintiff-signatory sought relief in arbitration and litigation for the same contract breach. The intervenors and Vallejo are not seeking the same relief for the same claim. While all allege that Garda failed to pay them overtime under the FLSA, the intervenors do not seek relief for

11

Garda's failure to pay Vallejo overtime, and Vallejo is not seeking relief for Garda's failure to pay the intervenors. The second *Waste Management* factor weighs against a stay.

Under the third *Waste Managment* factor, the court examines the litigation's impact on the arbitration. *Id.* at 343. Garda contends that the arbitration will "inevitably influence critically how the evidence is presented in the litigation." (Docket Entry No. 52, at 4). The question is not whether or how arbitration will influence the litigation, but whether the litigation will adversely affect the parties' right to arbitrate. *Waste Mgmt.*, 372 F.3d at 343 ("The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration."). Litigation of the intervenors' claims does not undermine Garda's ability to arbitrate its claims with Vallejo. The *Waste Managment* factors weigh against a mandatory stay.

### 2. A Discretionary Stay

Garda alternatively asks the court to exercise its discretion to stay the litigation of the intervenors' claims pending the arbitration of Vallejo's claims. (Docket Entry No. 52, at 5–6). Even though § 3's mandatory stay does not apply, "a court may still exercise its discretion to stay litigation . . . as a means of controlling and managing the docket." *Suzlon Infrastructure, Ltd. v. Pulk*, No. 09–CV–2206, 2010 WL 3540951, at *4 (S.D. Tex. Sept. 10, 2010). But the record does not support a discretionary stay. Allowing the intervenors' litigation to continue will not disrupt, conflict with, or undermine the arbitration. Nor will the arbitration make the litigation more burdensome, costly, or time-consuming. The court will monitor and manage the litigation to minimize any negative effects from the fact of two proceedings.

### B. The Motion for a Stay Pending Appeal

Garda alternatively requests a discretionary stay pending its appeal of this court's order denying the motion to compel arbitration of the intervenors' claims. (Docket Entry No. 52, at 6–9). To determine whether a district court should grant a discretionary stay pending an interlocutory appeal, district courts use a four-factor test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure other parties interested in the proceedings; and (4) [whether] public interest [favors a stay]." *Weingarten Realty Investors. v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011) (brackets in original) (internal quotations omitted).

The present record does not warrant a stay. With respect to the first factor, Garda claims that the court erred in denying the motion to compel arbitration of the intervenors' claims on the theory that their claims are covered by the arbitration agreement in the collective-bargaining agreement. (Docket Entry No. 52, at 7–8). The June 2013 Memorandum and Order explained why the intervenors' claims are not subject to arbitration. Garda has not made the necessary showing to support a stay pending the appeal from this Order.

As to the second factor, Garda contends that litigating the intervenors' claims will cause irreparable harm because it will lose the benefits of arbitration. But the record does not support the argument that allowing the litigation to proceed will adversely affect, much less frustrate, the Vallejo arbitration.

Finally, Garda argues that the public interest weighs in favor of a stay by pointing to the "liberal policy favoring arbitration," *Concepcion*, 131 S. Ct. at 1749 (internal quotations omitted), and the interest of judicial economy. But the arbitration of the claims Vallejo asserted is not

threatened by the litigation of the intervenors' claims. And there is both a public and private interest in allowing the intervenors, who have not contractually relinquished their right to take their claims to court, the ability to do so. *See Weingarten*, 661 F.3d at 913. Neither the court nor the parties are condemned to inefficiency by allowing the litigation to proceed. A discretionary stay pending the appeal of the order denying Garda's motion to compel arbitration of the intervenors' claims is denied.

## III. Conclusion

Garda's motion to stay litigation of the intervenors' claims pending arbitration and appeal, (Docket Entry No. 52), is denied. A status conference is set for December 10, 2013, at 8:30 a.m. in Courtroom 11-B.

SIGNED on November 26, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge