**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHRISTIAN VALLEJO, individually and on behalf of all similarly situated current and former employees,** | § § § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:12-cv-00555** |
| | § | |
| **GARDA CL SOUTHWEST, INC.,** | § § | |
| | § | |
| **Defendant.** | § § | |

_____

**DEFENDANT'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

_____

Robert F. Friedman (Attorney in Charge)
Texas State Bar No. 24007207
Southern District No. 382
rfriedman@littler.com
Edward F. Berbarie
Texas Bar No. 24045483
Southern Dist. No. 941117
eberbarie@littler.com

LITTLER MENDELSON, P.C.
A Professional Corporation
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX 75201-2931
214.880.8100
214.880.0181 (Facsimile)

ATTORNEYS FOR DEFENDANT
GARDA CL SOUTHWEST, INC.

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION ................................................................................................... 1

II.     Nature and stage of proceeding ............................................................................. 2

III.    Statement of issues ................................................................................................. 3

IV.     undisputed facts ..................................................................................................... 4

        A.     Garda's Operations .................................................................................... 4

        B.     Garda's driver/messenger/guards ............................................................. 5

        C.     Products Transported in Interstate Commerce ......................................... 7

        D.     The Armored Vehicles Used By Plaintiffs .............................................. 10

        E.     Additional Relevant Facts ........................................................................ 11

V.      ARGUMENTS AND AUTHORITIES ................................................................. 12

        A.     Summary Judgment Standard ................................................................... 12

        B.     Plaintiffs are Exempt from the Overtime Provisions of the FLSA Pursuant
               to Section 213(b)(1) ................................................................................. 12

        C.     Winn's FLSA Claims are Barred by Limitations ..................................... 20

        D.     Plaintiffs' State-Law Claims Should Also Be Dismissed As a Matter of
               Law ............................................................................................................ 21

        E.     Alternatively, the Court Should Properly Decline to Exercise Jurisdiction
               Over the Remaining State-Law Claims .................................................... 23

VI.     CONCLUSION ..................................................................................................... 23

CERTIFICATE OF SERVICE .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 106 S. Ct. 2505 (1986) ...................................................................12

*Baez v. Wells Fargo Armored Serv. Corp.,*
938 F.2d 180 (11th Cir. 1991) ...........................................................13, 14, 19, 20

*Billings v. Rollins Frito-Lay Sales, L.P.,*
413 F.Supp.2d 817 (S.D. Tex. 2006) ...................................................................13

*Carlsbad Tech., Inc. v. HIF BIO, Inc.,*
556 U.S. 635 (2009) ..............................................................................................3

*Castillo v. Gared, Inc.,*
1 S.W.3d 781 (Tex. App. -- Houston [1st Dist.] 1999, pet. denied) .....................22

*Celotex v. Catrett,*
477 U.S. 317 (1987) .........................................................................................3, 12

*Certain Underwriters at Lloyd's v. Warrantech Corp.,*
461 F.3d 568 (5th Cir. 2006) ...............................................................................23

*Chance v. Aurora Loan Services, L.L.C.,*
No. 3:11-CV-1237-BH, 2012 U.S. Dist. LEXIS 36582, 2012 WL 912939 (N.D. Tex.
Mar. 19, 2012) ......................................................................................................22

*Cox v. Brookshire Grocery Co.,*
919 F.2d 354 (5th Cir. 1990) ...............................................................................20

*Garza v. Smith Intl.,*
2011 WL 835820 (S.D. Tex. Mar. 7, 2011) .........................................................14

*Glanville v. Dupar, Inc.,*
H-08-2537, 2009 WL 3255292 (S.D. Tex. Sept. 25, 2009) ............................13, 16

*Hernandez v. Brink's Inc.,*
2009 U.S. Dist. LEXIS 2726 (S.D. Fla. Jan. 15, 2009) .............................14, 19, 20

*Jaramillo v. Garda, Inc.*,
    2012 WL 4955932 (N.D. Ill. Oct. 17, 20120).......................................................14

*Lucas v. Noypi, Inc.*,
    H-11-1940, 2012 WL 4754729 (S.D. Tex. Oct. 3, 2012) ...................................17

*LVI Facility Servs. v. Watson Rd. Holding Corp.*,
    2013 U.S. Dist. LEXIS 142064 (W.D. Tex. Oct. 1, 2013) ..................................22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 106 S. Ct. 1348 (1986)...............................................................12

*Merchants Fast Motor Lines, Inc. v. I.C.C.*,
    528 F.2d 1042 (5th Cir. 1976) ............................................................................16

*Morris v. McComb*,
    332 U.S. 422 68 S. Ct. 131 (1947) .....................................................................15

*Sinclair v Beacon Gasoline Co.*,
    447 F.Supp. 5 (E.D. La. 1976), aff'd 571 F.2d 978 (5th Cir. 1978)....................15

*Songer v. Dillon Resources, Inc.*,
    618 F.3d 467 (5th Cir. 2010) ...........................................................12, 13, 16, 17

*United Mine Workers v. Gibbs*,
    383 U.S. 715 (1996) ...........................................................................................23

### STATUTES

28 U.S.C. sec. 1367.....................................................................................................23

28 U.S.C. § 1367(c) ................................................................................................3, 23

29 U.S.C. 213(b)(1) ......................................................................................................2

29 U.S.C. § 207(a) ......................................................................................................12

29 U.S.C. § 213(b)(1) ..................................................................................................12

29 U.S.C. § 255(a) ......................................................................................................20

### OTHER AUTHORITIES

29 C.F.R. §§ 782.2(b)(1), 782.3 ...........................................................14, 15, 17, 18

29 C.F.R 782.4 .......................................................................................14, 15, 17, 18

29 C.F.R. 782.5 ......................................................................................14, 15, 17, 18

FED. R. CIV. P. 56 .................................................................................................................12

FED. R. CIV. P. 56(c) ..............................................................................................................3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **CHRISTIAN VALLEJO, individually and on behalf of all similarly situated current and former employees,** | § § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **CIVIL ACTION NO. 4:12-cv-00555** |
| **GARDA CL SOUTHWEST, INC.,** | § § | |
| **Defendant.** | § § § | |

## DEFENDANTS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Garda CL Southwest, Inc. ("Garda" or "Defendant") files this Motion and Memorandum of Law in Support of Motion for Summary Judgment.[1]

## I.
### INTRODUCTION

On December 10, 2012, Plaintiffs Artemio Caballero ("Caballero"), Karlnetta Coleman ("Coleman") and Jason Winn ("Winn") (collectively "Plaintiffs') filed a Complaint in Intervention[2] under the Fair Labor Standards Act (FLSA), seeking overtime pay. Plaintiffs are not entitled to overtime because they are covered by the Motor Carrier Act ("MCA")

---

[1]Defendant files this Motion for Summary Judgment without waiver of its position that Plaintiffs' claims are subject to arbitration under a binding arbitration agreement. Plaintiffs filed their Motion for Collective Action Certification on January 31, 2013 (Doc. 63). Defendant filed its Response on March 14, 2014. However, until a ruling by the Fifth Circuit, Defendant is forced to defend its position in this Court, and files this Motion for Summary Judgment accordingly.

[2]Christian Vallejo originally filed a Complaint under the FLSA on February 23, 2012. The Plaintiffs filed consents to join the original lawsuit on October 18, 2012. Vallejo's claims were subsequently dismissed by the Court and Plaintiffs' moved to intervene. Caballero, Coleman and Winn are the current and only plaintiffs in this lawsuit.

exemption.[3]   Additionally, Winn's claims are barred by the statute of limitations.   Lastly, Plaintiffs' state-law claims based upon fraud and negligence also fail as a matter of law, or alternatively, this Court should decline to exercise jurisdiction over Plaintiff's remaining state law claims for fraud and negligence.

## II.
## NATURE AND STAGE OF PROCEEDING

Christian Vallejo filed a purported collective action against Garda on or about February 23, 2012, alleging violations of the overtime compensation requirements of the FLSA.  (Doc. No. 16).  On October 18, 2012, three other Garda employees—Caballero, Coleman, and Winn— filed opt-in notices and then moved to intervene. (Doc. Nos. 19–21, 32).   Subsequently, the Court granted Garda's motion to compel Vallejo to arbitrate and dismissed his claims. (Doc. No. 36).  In the same Order granting Garda's motion to compel arbitration of Vallejo's claims, the Court also granted Plaintiffs' motion to intervene.   Therefore, the current plaintiffs are Caballero,[4] Coleman and Winn.  Garda subsequently moved to dismiss or stay the proceedings and compel arbitration as to Plaintiffs, which the Court denied.  (Doc. No. 45). On June 21, 2013, Garda filed a Notice of Appeal of that order. (Doc. No. 48).  Oral argument on the appeal is scheduled for April 1, 2014.

In their Complaint in Intervention (Doc. No. 33), which is the live pleading, Plaintiffs appear to incorporate the claims from Vallejo's First Amended Complaint for overtime violations of the FLSA, and state law claims for fraud, fraudulent inducement, fraud by nondisclosure, negligence, negligent misrepresentation and negligent hiring.  Plaintiffs' FLSA

[3] 29 U.S.C. 213(b)(1) is also referred to as Section 13(b)(1) and/or the Motor Carrier Act.  Accordingly, these terms shall be used interchangeably.

[4] On March 12, 2014, Defendant filed a motion to dismiss Caballero's claims based on his failure to twice appear for his agreed-to and properly noticed deposition (Doc. 69).  However, in an abundance of caution, Defendant moves for summary judgment on his claims.

claim is limited to their contention that they are owed a half-time premium for hours worked between 40 and 50 in a workweek.

The foregoing Motion and evidence submitted in support of this Motion demonstrate that Defendant is entitled to judgment as a matter of law on Plaintiffs' FLSA and state-law claims for fraud and negligence.

### III.
### STATEMENT OF ISSUES

The issues to be determined by the Court are (1) whether, as a matter of law, Plaintiffs' claims for overtime pay under the FLSA fail because they are each covered by the MCA exemption; (2) whether, as a matter of law, Winn's claims fail based upon the applicable statutes of limitations; (2) whether, as a matter of law, Plaintiffs' state-law claims based upon fraud and negligence fail; and (4) whether the Court should even continue to exercise jurisdiction over Plaintiffs' state-law claims. Summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex v. Catrett*, 477 U.S. 317, 327 (1987). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A district court's decision to decline supplemental jurisdiction under 28 U.S.C. § 1367(c) and to remand state law claims after dismissal of all federal claims in the case is reviewed on appeal for an abuse of discretion. *Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 556 U.S. 635, 640 (2009).

**IV.**
**UNDISPUTED FACTS**

**A.     Garda's Operations**

1.     Garda is a full service cash logistics company that processes, transports and handles currency, coins, checks, and other valuables for financial institutions and retailers. (Ex. 1, Declaration of James Robert Hammond, ¶ 4) (App. 1.)[5]  Garda's business at the Houston Branch includes transporting coin, currency, checks, and other valuables to and from customers in the Houston area. (*Id.*; Ex. 2, Excerpts from the Deposition of Jason Winn, 25:5-22) (App. 1; 14.)  The Houston Branch's customers include national banks and retail chains, such as U.S. Federal Reserve Banks ("Federal Reserve"), Chase, IBC Bank, Wells Fargo, Bank of America, PNC Bank, Ross Dress for Less, JCPenney, Sears, Home Depot, Office Depot, Staples, BestBuy, bank processing centers, check cashing centers, and various other retail establishments and other entities. (Ex. 1, ¶ 5; Ex. 2, 52, 53:1-5.) (App. 2; 39-40.)

2.     Garda utilizes employees with the title "driver/messenger/guards" at its branch in Houston, Texas ("Houston Branch"), to transport currency, coin, checks, and other valuables in armored vehicles to and from the Houston Branch and its customers' financial institutions, Automatic Teller Machine ("ATM") locations, and retail establishments.  (Ex. 1, ¶ 4) (App. 1.)

3.     Garda is a "contract carrier" and holds U.S. Department of Transportation ("DOT") Federal Motor Carrier Safety Administration ("FMCSA") number 771623.   (Ex. 1, ¶ 19) (App. 4.)

4.     Every Garda driver/messenger/guard must comply with certain FMCSA regulations, and Garda is responsible for verifying that its driver/messenger/guards are authorized under the FMCSA to drive Garda's vehicles.  (Ex. 1, ¶ 20) (App. 4.)   Garda's

---

[5] The exhibits referenced in this motion are part of the appendix that has been filed together with this motion.

driver/messenger/guards must operate Garda's armored vehicles according to the safety standards set forth by the FMCSA, and the vehicles must be loaded and unloaded by Garda's driver/messenger/guards in accordance with the safety standards set forth by the FMCSA. (*Id.*)

**B.**     **Garda's driver/messenger/guards**

5.      All three Plaintiffs worked for Garda as driver/messenger/guards at Garda's Houston Branch. (Ex. 1, ¶¶ 2-3) (App. 1.) Plaintiffs almost exclusively worked for Garda at its Houston Branch; only Coleman worked one week of her employment at Garda's branch located in North Houston. (Ex. 2, 38:14-25, 39:1-7; Ex. 3, 22:14-22) (App. 25-26; 94.)

6.      Driver/messenger/guards are assigned their routes and assignments at the Houston Branch on a bi-weekly, weekly, or daily basis based on customer needs and the needs of Garda's business. (Ex. 1, ¶ 15) (App. 3.) Daily routes and assignments are subject to change depending on customer needs on each specific day. (*Id.*) Any driver/messenger/guard, including Plaintiffs, could be assigned any route or assignment on any given day at Garda's sole discretion. (*Id.*; Ex. 2, 33:11-23) (App. 3; 20.)

7.      Each route or assignment to transport currency, coin, checks and/or other valuables is generally performed by two driver/messenger/guards; one of the driver/messenger/guards will drive the armored vehicle and the other driver/messenger/guard will perform the messenger role, which means physically loading and unloading the armored vehicle at the Houston Branch and the stops along the route and physically getting out of the vehicle at stops along the route to pick-up and deliver the currency, coin, checks, and/or other valuables. (Ex. 1, ¶ 16; Ex. 2, 41:7-25, 42-71, 72:1-17) (App. 3-4; 28-29, 60.) On occasion, the driver/messenger/guards may switch roles mid-route.     (Ex. 1, ¶16) (App. 3-4.)     The

driver/messenger/guard performing the messenger role must always be ready and able to drive the armored vehicle if necessary, if for example the driver becomes tired or incapacitated.  (*Id.*)

8.    There are no driver/messenger/guards who are only expected to exclusively perform the messenger role.  (Ex. 1, ¶ 17) (App. 4.)  Driver/messenger/guards are assigned their role as a driver or messenger for a given route on a weekly or daily basis based on customer needs and the needs of Garda's business.  (*Id.*)  Any driver/messenger/guard, including Plaintiffs, could be assigned either the driver or messenger role for any route or assignment on any given day at Garda's sole discretion, and assignments are always subject to change based on the needs of the business.  (*Id.;* Exhibit 3, Excerpts from the deposition of Karlnetta Coleman 22:10-13) (App. 4; 94.)

9.    Both of the driver/messenger/guards on a route, regardless of their role as a driver or messenger, are responsible for seeing that the armored vehicle is safe to drive and safely operated along the route and that the currency, coin, checks and/or other valuables are safely transported.  (Ex. 1, ¶ 18; Ex. 2, 25:17-22, 95:23-25, 96:1-11; Ex. 3, 27:9-14, 71:3-17, 166:4-17.) (App. 4; 14, 65-66; 97, 103, 117.)

10.    The driver/messenger/guard performing the driver role on the route performs a safety inspection of the vehicle prior to beginning the route, helps load the cash onto the armored vehicle, actually drives the armored vehicle on the route, documents certain things along the route, and acts as a look-out while the messenger is loading and unloading the armored vehicle at customer stops along the route.  (Ex. 2, 95:11-25, 96-102, 103:1-18) (App. 65-66, 73.)  However, <u>both</u> the driver and messenger are responsible for making sure that (a) the vehicle is able to safely perform the route on a given day, (b) the vehicle is in good working condition, and (c) the vehicle can safely perform whatever function necessary for the route.  (*Id.* at 95:23-25, 96:1-11)

(App. 65066.)  Both the driver and the messenger work together to make sure the route and truck are safely driven.  (*Id.* at 101:20-25, 102:1-10) (App. 71-72.)  And, the messenger also assists the driver in driving the vehicle and needs to be able to relieve the driver if the driver starts to show signs of fatigue.  (*Id.* at 99:12-23) (App. 69.)

11.     Both Coleman and Winn testified during their depositions that when they were performing the messenger role on a route they were also acting as the "crew leader" or "crew chief."  (Ex. 2, 40:24-25; Ex. 3, 161:19-22) (App. 27, 115.)  Coleman testified that as the crew leader on each route, "we were responsible for the route, most – we were both responsible for what happened on the route, but being the crew leader, you're – pretty much the one who says where we're going, how we're going to run the route, which way we're going to go next..."  (Ex. 3, 161:19-25; 162:1-2) (App. 115-116.)  Winn testified that as the crew chief on each route his job was to manage and run the route.  (Ex. 2, 79:11-20) (App. 62.)

## C.     Products Transported in Interstate Commerce

12.     The Houston Branch regularly, and usually on a daily basis, receives currency and coin from the Federal Reserve.  (Ex. 1, ¶ 7) (App. 2.)  Garda's driver/messenger/guards will pick up the currency and coin from the Federal Reserve and transport the currency and coin to the Houston Branch for delivery to its customers, who have placed an order for the currency and coin to be delivered to them.  (*Id.*)  Garda's driver/messenger/guards will then deliver to its customers the currency and coin received from the Federal Reserve.  (*Id.*)

13.     A significant portion of the coins that Garda receives from the Federal Reserve (more than approximately 25%) are freshly minted coins that have not yet been in circulation. (Ex. 1, ¶ 8) (App. 2.)`  These coins originate from one of the U.S. Mint facilities located outside of the state of Texas and are picked up from the Federal Reserve by Garda's

driver/messenger/guards and transported to the Houston Branch for delivery to Garda's customers who have ordered the coins to be delivered to them. (*Id.*) Garda's driver/messenger/guards then deliver to its customers the freshly minted coins received from the Federal Reserve and that originated from a U.S. Mint facility outside of the state of Texas. (*Id.*)

14. All driver/messenger/guards working at the Houston Branch, including Plaintiffs, regularly handle(d) and transport(ed) currency and coin received directly from the Federal Reserve, or could be called upon to do so at any time on any given day. (Ex. 1, ¶ 9) (App. 2.)

15. Throughout his employment with Garda including currently, Caballero has on a weekly basis, and usually a daily basis, transported currency and/or coin that Garda received directly from the Federal Reserve. (Ex. 1, ¶ 10) (App. 2-3.) For example, Caballero has primarily serviced a route for IBC Bank. (*Id.*) IBC Bank orders currency and coin from the Federal Reserve; Garda driver/messenger/guards will then pick up and transport the currency and coin to the Houston Branch to be delivered to IBC Bank locations; and Caballero will then transport the currency and coin ordered by IBC Bank and received directly from the Federal Reserve to the IBC Bank locations on his route. (*Id.*)

16. Winn also, on a weekly or daily basis, transported currency and/or coin received directly from the Federal Reserve because he too serviced an IBC Bank and other routes that transported currency and coin received directly from the Federal Reserve. (Ex. 1, ¶ 10) (App. 2-3.)[6]

17. The Houston Branch has what it refers to as "Commercial Routes" and "ATM Routes." (Ex. 1, ¶ 11) (App. 3.) On "Commercial Routes," the driver/messenger/guards will

---

[6] Winn testified during his deposition that he did not know where the currency came from that he transported as a driver/messenger/guard (Ex. 2, 46:18-24) ) (App. 33.), and he did not know the interplay between Garda and the Federal Reserve. (*Id.* at 105:24-25, 106:1) ) (App. 74-75.)

pick up currency, coin, and checks from customers' retail locations to be deposited in financial institutions, and the driver/messenger/guards then transport and deliver the currency, coin, and checks either directly to the designated financial institution or to the Houston Branch. (*Id*.) Currency, coin, and checks received at the Houston Branch from the "Commercial Route" is then transported and delivered to the designated financial institution by Garda's driver/messenger/guards. (*Id*.) Driver/messenger/guards on these "Commercial Routes" regularly, and at the very least on a weekly basis, transport hundreds of checks, including checks from banks outside of the state of Texas. (*Id*.)

18.     On the "ATM Routes," driver/messenger/guards will transport currency, that is to be dispensed from ATMs, to and from the Houston Branch and the ATMs. (Ex. 1, ¶ 12) (App. 3.) Currency that is picked up from ATMs by driver/messenger/guards is transported to the Houston Branch and is then transported to the financial institution by Garda's driver/messenger/guards. (*Id*.) Driver/messenger/guards on the ATM route will also pick up deposits that have been made to an ATM, including currency and checks, and then transport and deliver the deposits to the Houston Branch, where it is then delivered to or picked up by the designated financial institution. (*Id*.) Driver/messenger/guards on these "ATM Routes" regularly, and at the very least on a weekly basis, transport hundreds of checks, including checks from banks outside of the state of Texas. (*Id*.)[7]

19.     All driver/messenger/guards working at the Houston Branch, including Plaintiffs, regularly transport currency and checks as described in paragraphs 11 and 12 above, including checks from banks outside the state of Texas, or could be called upon to do so at any time on any given day. (Ex. 1, ¶ 13) (App. 3.)

---

[7] Winn stated during his deposition that he mostly serviced commercial routes during his employment with Garda. (Ex. 2, 48:20-24) ) (App. 35.).

20.     Coleman, for most of her employment, serviced a Chase ATM route, where her job was to: (a) transport currency she loaded in her truck from the Houston Branch to load into ATMs and (b) take cash and checks from the ATMs, load them into her truck, and transport them to the bank or back to the Houston Branch.  (Ex. 1, ¶ 14; Ex. 3, 29:5-25, 30:1-10) (App. 3; 98-99.)  While servicing this route, she handled and transported hundreds of checks on a weekly or daily basis, including checks from banks outside the state of Texas.  (*Id*.)  Coleman acknowledged during her deposition that it was common for her to pick up hundreds of checks from Chase ATMs to deliver to Chase.  (Ex. 3, 64:1-16) (App. 100.)  Likewise, Winn testified during his deposition that, for the last five years of his employment, he was picking up cash and checks every week from approximately 250 locations that was to be deposited with financial institutions.  (Ex. 2, 75:11-23) (App. 61.)

21.     Coleman regularly handled and transported currency ordered by Chase from the Federal Reserve.  (Ex. 1, ¶ 14) (App. 3.)  A large portion of the currency transported by Garda driver/messenger/guards, including Coleman, on the Chase ATM route came directly from Chase, but when the currency arrives at the Houston Branch it is still in its original and unopened packages from the Federal Reserve.  (*Id*.)  Coleman acknowledged during her deposition that the cash she loaded into her vehicle and transported from Garda to ATMs on a daily basis came from the Federal Reserve (Ex. 3, 169:14-17) (App. 118.), and then later testified that she merely "assumed it came from the Federal Reserve."  (*Id.* at 170:3-14) (App. 119.)

D.      **The Armored Vehicles Used By Plaintiffs**

22.     The only vehicles used by Plaintiffs to perform their duties as driver/messenger/guards all have a gross vehicle weight rating ("GVWR") over 10,001 pounds.  (Ex. 1, ¶ 6, Exs. 1-A, 1-B, and 1-C) (App. 2, 5-7.)  Throughout their employment with Garda, the

only types of vehicles in Garda's fleet that Plaintiffs used/use to perform their duties as driver/messenger/guards would have been a Ford F800, Ford F650, and a Ford E350, all of which have a GVWR of over 10,001 pounds. (*Id.*)[8]

## E.    Additional Relevant Facts

23.    Winn's employment with Garda ended in September of 2010. (Ex. 2, 19:25, 20:1-9) (App. 32-33.) For each week during the last five years of his employment, Winn spent approximately 40% of his time actually driving the armored vehicles on the routes he was assigned, and the other 60% of the week he spent performing the messenger role. (Ex. 2, 29:17-25, 30:1-18) (App. 16-17.)

24.    Coleman was employed by Garda for approximately one year, from approximately January of 2011 until January of 2012. (Ex. 3, 12:11-15; 117:5-10) (App. 91-114.) During her first two months of employment she only served the role of the driver on routes, and after that, she estimates that each week of her employment she served as the driver 10% of the time and the messenger 90% of the time. (*Id.* at 20:24-25, 21, 22:1-9.)

25.    Winn testified during his depositions that the duties he described for driver/messenger/guards were the same for all Garda drivers/messengers/guards. (Ex. 2, 81:23-25, 82:1-24) (App. 63-64.)

---

[8] Plaintiffs Winn and Coleman were asked repeatedly during their depositions what they knew about the armored vehicles they used at Garda, and neither could provide any information about the make and models of the vehicles and nor did they ever state they knew the weight of the vehicles. (*See, e.g.,* Ex. 2, 32:5-25, 33-37, 38:1) ) (App. 19-25.) Winn did testify that he only drove two types of armored vehicles during his employment: a "large bank truck" and a "regular size truck." (Ex. 2, 32:5-10) ) (App. 19.) However, Winn acknowledged that even the "regular size truck" was "larger than your commercial trucks," but it was smaller than the larger bank trucks. (*Id.* at 35:12-18) ) (App. 22.)

**V.**
<u>**ARGUMENTS AND AUTHORITIES**</u>

**A.**     <u>**Summary Judgment Standard**</u>

Summary judgment is proper if no genuine issue of material fact exists. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). Once the movant demonstrates its absence, the burden shifts to the nonmovant to establish a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S. Ct. 1348 (1986). Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Id.* at 586-87. Plaintiffs must present specific "concrete evidence from which a reasonable juror could return a verdict in [their] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505 (1986).

The summary judgment evidence establishes that (1) the MCA exemption applies to Plaintiffs; (2) Winn's FLSA claim is barred by limitations; and Plaintiffs state-law claim for fraud and negligence fail.

**B.**     <u>**Plaintiffs are Exempt from the Overtime Provisions of the FLSA Pursuant to Section 213(b)(1)**</u>

Under the FLSA, non-exempt employees are entitled to overtime. 29 U.S.C. § 207(a). Employees, however, who fall under the MCA exemption are not. 29 U.S.C. § 213(b)(1).

The FLSA exempts "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service..." *Songer v. Dillon Resources, Inc.*, 618 F.3d 467, 471-72 (5th Cir. 2010) (citing 29 U.S.C. § 213(b)(1)). The Secretary of Transportation (the "Secretary"), in turn, has the power to regulate employees of motor carriers whose duties affect highway safety when interstate shipments are involved. *See*

*Songer*, 618 F.3d at 472, n.7 (citing 49 U.S.C. § 31502(b)(1); *Billings v. Rollins Frito-Lay Sales, L.P.,* 413 F.Supp.2d 817, 820 (S.D. Tex. 2006). "The Secretary ... need only possess the power to regulate the employees at issue; it need not actually exercise that power for the [MCA] exemption to apply." *Songer*, 618 F.3d at 472 (quoting *Barefoot v. Mid-American Dairymen, Inc.*, 1994 WL 57686, at *2 (5th Cir. Feb. 18, 1994)).

For the MCA exemption to apply, the employer must establish three elements: (1) the employee must be employed by a motor carrier subject to the Secretary's power; (2) the employee must engage in activities directly affecting the safety of motor vehicles; and (3) the employee's activities must involve the interstate transportation of goods. *Songer*, 618 F.3d at 472-73; *Glanville v. Dupar, Inc.,* H-08-2537, 2009 WL 3255292, at *3 (S.D. Tex. Sept. 25, 2009) (J. Rosenthal); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 181 (11th Cir. 1991). The Fifth Circuit has defined "interstate commerce" as "the actual transport of goods across state lines <u>or the intrastate transport of goods in the flow of interstate commerce</u>." *See Songer,* 618 F.3d at 472 (emphasis added) (quoting *Siller v. L & F Distributors, Ltd.,* 1997 WL 114907, at *1 (5th Cir. 1997).

1.    *Garda is a "Motor Carrier" Subject to the Secretary of Transportation's Jurisdiction*

Garda is a "Motor Carrier" subject to the Secretary's jurisdiction under the MCA. Under the MCA, a "motor carrier" is "a person who provides commercial motor vehicle transportation for compensation." *Glanville,* 2009 WL 3255292, at *4 (quoting 49 U.S.C. § 13102(14)). A commercial motor vehicle is a vehicle weighing at least 10,001 pounds or with a gross vehicle weight rating of at least 10,001 pounds, whichever is greater. *Id.* (citing 49 U.S.C. § 31132(1)).

Here, it is undisputed that Garda transports currency, coins, checks, and other valuables in its vehicles for compensation (Ex. 1, ¶ 4; Ex. 2, 25:5-22) (App. 1; 14.), and it is undisputed

that the only trucks used by Plaintiffs to perform their duties as driver/messenger/guards all had a GVWR of more than 10,001 pounds. (Ex. 1, ¶ 6, Exs. 1-A, 1-B, and 1-C) (App. 2, 5-7.)

It is also undisputed that Garda is a registered "contract carrier" and holds U.S. Department of Transportation FMCSA number 771623. (Ex. 1, ¶ 19) (App. 4.) Therefore, jurisdiction has already been exercised by the Secretary. *See, e.g., Baez*, 938 F.2d at 182; see also *Jaramillo v. Garda, Inc.*, 2012 WL 4955932, at *1 (N.D. Ill. Oct. 17, 20120) (granting summary judgment on Motor Carrier exemption and finding Garda CL Great Lakes, Inc., was a motor carrier.).

2. *Plaintiffs' Driver/Messengers' Duties Directly Affect the Safety of Operation of Motor Vehicles*

Garda's drivers/messengers are engaged in activities that directly affect the operational safety of the armored vehicles. The Secretary has specifically determined that employees who (1) drive the motor vehicle; (2) ride on armored trucks in capacities other than that of driver, and (3) load and unload vehicles are responsible for, and affect the safety of, motor vehicles. 29 C.F.R. §§ 782.2(b)(1), 782.3 ("Drivers"), 782.4 ("Drivers Helpers"), 782.5 ("Loaders"); *see also Garza v. Smith Intl.*, 2011 WL 835820, at *5 (S.D. Tex. Mar. 7, 2011) (noting Motor Carrier Act exemption applies to drivers, drivers helpers and loaders and granting summary judgment on the MCA exemption). Accordingly, the regulations prescribed by the Department of Labor under the Motor Carrier Act to address safety operations apply to the positions and responsibilities held by Plaintiffs. *See, e.g., Baez*, 938 F.2d 180 (Motor Carrier Act exemption applies to driver-guards and messenger-guards); *Hernandez v. Brink's Inc.*, 2009 U.S. Dist. LEXIS 2726, *10 (S.D. Fla. Jan. 15, 2009) (Plaintiffs who worked as Drivers [and Messengers] fall within the regulation's definition of drivers who affect the safety of operation and are therefore covered by the FLSA's motor carrier exemption).

And, the evidence is clear and undisputed that Plaintiffs' duties and responsibilities affected the safety of the operation of the armored vehicles, even when they were acting as the "messenger," and not actually driving:[9]

- Both of the driver/messenger/guards on a route, regardless of their role as a driver or messenger, are responsible for seeing that the armored vehicle is safe to drive and safely operated along the route and that the currency, coin, checks and/or other valuables are safely transported. (Ex. 1, ¶ 18) (App. 4.)

- Both the driver and messenger are responsible for making sure that (a) the vehicle is able to safely perform the route on a given day, (b) the vehicle is in good working condition, and (c) the vehicle can safely perform whatever function necessary for the route. (Ex. 2 at 95:23-25, 96:1-11) (App. 65-66.)

- Both the driver and the messenger work together to make sure the route and truck are safely driven. (Ex. 2 at 101:20-25, 102:1-10) (App. 71-72.)

- The driver/messenger/guard performing the messenger role must always be ready and able to drive the armored vehicle if necessary. (Ex. 1, ¶ 16) (App. 3-4.)

- The messenger assists the driver in driving the vehicle and needs to be able to relieve the driver if the driver starts to show signs of fatigue. (Ex. 1, ¶ 16; Ex. 2 at 99:12-23) (App. 3-4; 69.)

---

[9]Although Plaintiffs delivered currency regularly and frequently on a daily and weekly basis, the extent of their delivery and pick up duties is not outcome determinative of the exemption. In *Morris v. McComb*, 332 U.S. 422 68 S. Ct. 131 (1947), the Supreme Court held that drivers who drove vehicles about 4% of the time were exempt. (Here Winn claims he served as the driver 40% of the time and Coleman claims to have served as the driver 10% of the time). However, the employee need not spend most or all of his time driving.

> . . . it is not a question of fundamental concern whether or not it is the larger or the smaller fraction of the employee's time or activities that is devoted to safety work. It is the character of the activities rather than the proportion of either the employee's time or activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment.

*Levinson*, 330 U.S. at 674-75. *See also Sinclair v Beacon Gasoline Co.*, 447 F.Supp. 5, 9-10 (E.D. La. 1976), aff'd 571 F.2d 978 (5th Cir. 1978) ("The test is not whether a substantial part of the employee's duties affect the safety of interstate operation of motor vehicles . . . The test then is whether a particular employee's duties have a substantial effect on the safety of operation in interstate commerce."). The Department of Labor takes the position that any Motor Carrier Act qualifying activity during a four month period qualifies the employee for the exemption from overtime for every work week during that four month period. *See e.g.,* Wage-Hour Field Operations Handbook, 24e01(b), 5/13/82; U.S. Dep't of Labor Op. Letter, Wage and Hour Division, letter FLSA2006-3. So the result is that if a driver makes an interstate run, or even could be called upon to do so, he or she is exempt for the next four months.

- Coleman and Winn also acted as the "crew leader" or "crew chief" when serving the messenger function, and Coleman testified that as the crew leader on each route, "we were responsible for the route, most – we were both responsible for what happened on the route, but being the crew leader, you're – pretty much the one who says where we're going, how we're going to run the route, which way we're going to go next..."   (Ex. 3, 161:19-25; 162:1-2) (App. 115-116.)  Winn testified that as the crew chief on each route his job was to manage and run the route.  (Ex. 2, 79:11-20) (App. 62.)

Therefore, Plaintiffs were employed in positions that undeniably affected the safety of operations of vehicles.

3.     *Plaintiffs' Activities Involved the Interstate Transportation of Goods*

Plaintiffs' activities also involved the interstate transport of goods in the flow of commerce.   For purposes of determining whether an employee is covered by the MCA exemption and specifically satisfies the "interstate commerce" element, the Fifth Circuit has defined "interstate commerce" to include "the intrastate transport of goods in the flow of interstate commerce." *See Songer,* 618 F.3d at 472 (quoting *Siller,* 1997 WL 114907, at *1).  As this Court has acknowledged, "Employers who transport solely within a single state are subject to the Secretary of Transportation's jurisdiction where the transportation is part of a 'practical continuity of movement' across state lines."   *Glanville,* 2009 WL 3255292, at *9 (quoting *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 569 (1943)); *see also Merchants Fast Motor Lines, Inc. v. I.C.C.,* 528 F.2d 1042, 1044 (5th Cir. 1976).

What is more, when determining whether Plaintiffs are engaged in interstate activities and subject to the jurisdiction of the Secretary,

> The pertinent inquiry is whether the employer establishes that the employee can be "reasonably expected" to engage in or to be asked to engage in safety-affecting duties in connection with interstate transport of property "in the ordinary course of his work."

*Lucas v. Noypi, Inc.*, H-11-1940, 2012 WL 4754729 at * (S.D. Tex. Oct. 3, 2012) (J. Lake)

(citing *Songer*, 618 F.3d at 474; *Reich v. American Driver Svc., Inc.*, 33 F.3d 1153, 1156 (5th

Cir. 1994); and 29 C.F.R. § 782.2(b)(3). The Fifth Circuit has explained why the key inquiry is

whether an employee can be <u>reasonably expected</u> to engage in activities in connection with the

interstate transport of property:

> In practical terms, the safety concerns facing a carrier who sent
> *every* driver on an interstate trip would be the same if the carrier
> sent only *some or most* of its drivers on interstate trips. Therefore,
> the ICC had the power to regulate all of defendant's drivers, and
> the *existence*—rather than the *exercise*—of that power was the test
> as to whether the employees were entitled to overtime pay under
> the FLSA.

*Songer*, 618 F.3d at 474 (emphasis in original) (citing *Morris v. McComb*, 332 U.S. 422, 433-34

(1947) and *Barefoot*, 1994 WL 57686, at *2)). To be sure, the MCA exemption applies, "even in

a workweek when the employee happens to perform no work directly affecting safety of

operation, so long as the employee's *continuing duties* involve activities that affect motor vehicle

safety in interstate transport." *Id.* at 475 (emphasis in original) (quoting 29 C.F.R. § 782.2(b)(3)

(internal quotations omitted).

Moreover, the Department of Labor's regulations provide that armed guards on armored

trucks activities "directly affect the safety of operation of such motor vehicles in interstate or

foreign commerce." 29 C.F.R. § 782.4(a). The Department of Labor has also opined that drivers

and driver helpers on armored vehicles are covered by the MCA exemption in its Opinion

Letters and Field Operations Handbook:

> (a)  In the usual operation of an armored car company the
> vehicles transport checks drawn on out-of-State banks as
> well as coins and currency to a bank for subsequent out-of-
> State transmittal. The transportation to the main bank for
> further transmittal is part of a "practical continuity of

movement" across State lines, making the Sec 13(b)(1) exemption applicable.

Wage-Hour Field Operations Handbook, 24c10(a), 2/26/99) (App. 135);  Opinion Letter, 1988 DOLWH LEXIS 42 (Dec. 21, 1988) (App. 136-137); 1997 DOLWH LEXIS 19 (March 12, 1997) (App. 138).  In noting that courts frequently find drivers of armored vehicles to be under the Secretary of Transportation's jurisdiction, the DOL stated:

> In construing the extent of the Section 13(b)(1) exemption, the courts have ruled that employees do not have to cross a state line to be subject to the exemption if they are transporting property destined for another state.  <u>Such property may consist of checks drawn on out-of-state banks transported by employees of an armored car company who do not drive across a state line</u>.

1997 DOLWH LEXIS 19. (emphasis added) (App. 138.)

Based on the above, Plaintiffs' duties are such that they could, at the very least, have been reasonably expected to engage in or to be asked to engage in safety-affecting duties in connection with interstate transport of property in the ordinary course of their work.  The Houston Branch usually picks-up and transports currency and coin from the Federal Reserve on a daily basis, including freshly minted coins that originated from a U.S. Mint location outside of the state of Texas for delivery to Garda's customers in the state of Texas.  (Ex. 1, ¶¶ 7 and 8) (App. 2.)  And, all driver/messenger/guards working at the Houston Branch, including Plaintiffs, regularly handle(d) and transported(ed) currency and coin received directly from the Federal Reserve, or could be called upon to do so at any time on any given day.  (*Id*. at ¶¶ 9, 10, 14) (App. 2-3.)  Moreover, the driver/messenger/guards working at the Houston Branch, including Plaintiffs, regularly transport hundreds of checks (at the very least on a weekly basis), including checks from out-of-state banks, or could be called upon to do so at any time on any given day. (*Id*. at ¶¶ 11, 12, 13, and 14) (App. 3.)

Not only has Garda established that Plaintiffs were actually regularly transporting: (a) currency from the Federal Reserve that had been ordered for delivery by Garda's customers; (b) freshly minted coins that originated from an out-of-state U.S. Mint facility that had been ordered for delivery by Garda's customers, and (c) checks from out-of-state banks; but at the very least, Garda has established that Plaintiffs *could* have been called upon to engage in these interstate transportation activities at any time and on any given day. It is undisputed that any driver/messenger/guard, including Plaintiffs, could be assigned any route or assignment on any given day at Garda's sole discretion. (Ex. 1 at ¶¶ 15 and 17*; Ex. 2, 33:11-23; Ex. 3, 22:10-13) (App. 3-4; 20; 94.) Accordingly, even if Plaintiffs were not actually engaging in these interstate activities – which they were – they could have been called upon to do so at any time.

Courts have held that Garda's services, such as transporting currency, coin, checks, and other valuables, involve the transportation of property in interstate commerce as defined by the Motor Carrier Act, even if the employees did not physically cross state line. *See, e.g., Baez*, 938 F.2d 180 (armored car company transporting cash, checks, and coin all within the local Miami area found to be engaging in interstate commerce); *Brink's, Inc.*, 2009 U.S. Dist. LEXIS 2726, at *7 (S.D. Fla. Jan. 15, 2009) (armored car company transporting out of state checks engaged in interstate commerce).

The *Brink's* and *Baez* decisions are instructive. Like Garda, Brink's is a secured transportation service company that provides armored vehicle transportation of customers' coin, currency, negotiable instruments and other valuables. *Id*. at *1. The court held that

> Brink's is a motor carrier that transports checks destined for banks outside of Florida and transports property destined for interstate and foreign locations. It is unnecessary for an employee to engage in interstate travel as long as the property being transported is bound for an interstate destination. . . [T]he nature of Brink's

relevant activities fall squarely within the meaning of interstate commerce for purposes of the Motor Carrier Act.

*Brink's*, 2009 U.S. Dist. LEXIS 2726, at * 7-8.

In *Baez*, – like here – the plaintiffs were employed by Wells Fargo as driver-guards, messenger-guards and/or guards, and Wells Fargo was engaged in security armored truck pickup and delivery services, involving the pickup and delivery of coins, currency and checks (both in state and out of state checks). *Baez*, 938 F.2d at 181. Also like the case at bar, the plaintiffs in Baez argued that they were not engaged in interstate commerce because their vehicles did not cross state lines. *Id.* at 182. And, just like the Court should do here, the Eleventh Circuit in *Baez* found that the plaintiffs were engaged in the interstate transport of goods under the MCA because they were transporting checks and other instruments bound for banks outside of the state. *Id.*

Plaintiffs were therefore engaged in the transportation of property in interstate commerce under the MCA, or at the very least could have been called upon at any time on any given day to do so. Accordingly, Garda has established that all three Plaintiffs are covered by the MCA exemption and their overtime claims under the FLSA therefore fail as a matter of law.

**C.**     **Winn's FLSA Claims are Barred by Limitations**

The FLSA provides a general two-year limitations period, but a three-year period for "willful" violations. 29 U.S.C. § 255(a). Plaintiff bears the burden to prove a willful violation; it cannot be presumed. *See Cox v. Brookshire Grocery Co.,* 919 F.2d 354, 356 (5th Cir. 1990). Winn's Complaint in Intervention does not even allege a willful violation—let alone provide any evidence to support such a claim. Under the general two-year limitations period, all of Winn's FLSA claims are time-barred because his employment with Garda ended on September 14, 2010 (Ex. 2, 19:25, 20:109) (App. 10-11.)— more than two years before either he filed his Complaint

(December 10, 2012) or filed his opt-in with the Court (October 18, 2012). Winn's FLSA claims

must be dismissed on this basis too.

**D.**     **Plaintiffs' State-Law Claims Should Also Be Dismissed As a Matter of Law**

      Plaintiffs have also each asserted identical claims for fraud, fraudulent inducement, fraud

by nondisclosure, negligence, negligent misrepresentation and negligent hiring. (Doc. 33 at p.

3). When Plaintiffs were each asked via interrogatories to explain the factual basis for these

state-law claims (*i.e.*, each and every act that they claim has been committed against them each

and serves as the basis for their state-law claims), they each provided them same substantive

answer:

> The Defendant is claiming I was a member of a Union while
> working for them. This is not true, I never attended a Union
> meeting, paid a due, or even knew any union officers (sic)
> additionally, Defendant alleges I bargained away certain of my
> rights.

(Ex. 4, Plaintiffs Responses to Interrogatories Number 20 and 21) (App. 121-134.) Winn and

Coleman both testified that these are complete answers and there are no other acts or omissions

or factual basis for these claims. (Ex. 2, 153, 154-55, 156:1-17; Ex. 3, 110:5-25, 111-12, 113:1-

15) (App. 80-83; 107-110.) Coleman also testified that the first part of the interrogatory

response ("The Defendant is claiming I was a member of a Union while working for them.") and

the last portion of the answer ("Defendant alleges I bargained away certain of my rights") are

simply positions taken by Garda in this litigation and that the remainder of her answer is her

simply explaining why those positions are wrong. (Ex. 3, 114:15-25, 115-16, 117:1-2)

(App. 111-114.). Winn also testified that the last portion of the answer ("Defendant alleges I

bargained away certain of my rights") is simply a position taken by Garda in the instant

litigation, and nothing more, and the middle portion of the answer ("This is not true, I never

attended a Union meeting, paid a due, or even knew any union officers") is simply an explanation of his position, but nothing Garda has done. (Ex. 2, 160:16-25, 168:17-25, 169:1-15) (App. 86, 87-88.) Although Winn does claim that while he was employed with Garda he was told he was a member of a union, he first stated during his deposition that these statements were made only by other driver/messenger/guards, but he later testified that some of the driver/messenger/guards may have actually been managers. (Ex. 2, 158:6-25, 159:1-19) (App. 84-85.) In any event, the fact that anyone simply told Winn during his employment that he was in a union is not sufficient, standing alone, to support any of his fraud or negligence claims.[10]

Accordingly, Plaintiff's state-law claims for fraud and negligence fail as a matter of law and should be dismissed.

---

[10] Under Texas law, the elements of a fraud claim are: (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result. *LVI Facility Servs. v. Watson Rd. Holding Corp.*, 2013 U.S. Dist. LEXIS 142064 at *35 (W.D. Tex. Oct. 1, 2013) ( citations omitted). "Fraudulent inducement, however, is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Id.* "The elements of a fraud by nondisclosure claim in Texas are: (1) the defendant failed to disclose facts to the plaintiff; (2) the defendant had a duty to disclose those facts; (3) the facts were material; (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts; (5) the defendant was deliberately silent when it had a duty to speak; (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting; (7) the plaintiff relied on the defendant's nondisclosure; and (8) the plaintiff was injured as a result of acting without that knowledge." *Id.* at 42. "Texas law recognizes a duty to disclose only where a fiduciary or confidential relationship exists." *Id.*

The elements of a negligence cause of action are a duty, a breach of that duty, and damages proximately caused by the breach of duty." *Castillo v. Gared, Inc.*, 1 S.W.3d 781, 786 (Tex. App. -- Houston [1st Dist.] 1999, pet. denied). A claim for negligent misrepresentation under Texas law consists of four elements: (1) the defendant made a representation in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Chance v. Aurora Loan Services, L.L.C.*, No. 3:11-CV-1237-BH, 2012 U.S. Dist. LEXIS 36582, 2012 WL 912939, at *5 (N.D. Tex. Mar. 19, 2012). In order to prevail on a claim of negligent hiring and supervision, a plaintiff must prove all the elements of a common law negligence claim; that is, she must prove that the employer owed her a legal duty to protect her against injury, that her employer breached that duty, and the breach proximately caused the plaintiff's injury. Garcia v. Hospice of El Paso, 2003 U.S. Dist. LEXIS 14243 at **14-15 (W.D. Tex. May 20, 2003) (citations omitted). The element of duty required to establish a claim of negligent hiring and supervision is premised on foreseeability. *Id.*

**E.** **Alternatively, the Court Should Properly Decline to Exercise Jurisdiction Over the Remaining State-Law Claims.**

In the event that the Court does not dismiss Plaintiffs' state-law claims based upon fraud and negligence, the Court should alternatively decline to exercise its supplemental jurisdiction over these claims. A court may, but is not required to, exercise supplemental jurisdiction over a state law claim when the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1996).[11] A trial court can, in its discretion, decline to exercise supplemental jurisdiction if: the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c). The Fifth Circuit has stated,

> Our inquiry starts with the mandatory nature of 28 U.S.C. § 1367(a), which provides that a district court 'shall' have supplemental jurisdiction over claims 'so related to' claims within the court's original jurisdiction. Yet § 1367(a)'s command is moderated by the factors provided in 28 U.S.C. § 1367(c), which allow a district court to decline supplemental jurisdiction under certain circumstances. In consideration of these factors, we have stated that it is our "general rule" that courts should decline supplemental jurisdiction when all federal claims are dismissed or otherwise eliminated from a case.

*Certain Underwriters at Lloyd's v. Warrantech Corp*., 461 F.3d 568, 578 (5th Cir. 2006). Here, and as the Fifth Circuit has instructed, this Court should decline to continue to exercise jurisdiction over Plaintiffs' state-law claims once their FLSA claims are dismissed.

## VI.
## CONCLUSION

Accordingly, based on the foregoing, Defendant is entitled to judgment as a matter of law on all of the claims brought by Plaintiffs. Alternatively, the Court should dismiss all of the Plaintiffs' FLSA claims and decline to exercise jurisdiction over Plaintiffs' state-law claims.

---

[11]Although *Gibbs* has been superseded by 28 U.S.C. sec. 1367, the conditions and limitations statutorily created do not affect the exercise of pendent jurisdiction here.

Dated March 17, 2014                    Respectfully submitted,


                                        */s/ Robert F. Friedman*
                                        Robert F. Friedman (Attorney in Charge)
                                        Texas State Bar No. 24007207
                                        Southern District No. 382
                                        rfriedman@littler.com
                                        Edward F. Berbarie
                                        Texas Bar No. 24045483
                                        Southern Dist. No. 941117
                                        eberbarie@littler.com

                                        LITTLER MENDELSON, P.C.
                                        A Professional Corporation
                                        2001 Ross Avenue
                                        Suite 1500, Lock Box 116
                                        Dallas, TX  75201-2931
                                        214.880.8100
                                        214.880.0181 (Facsimile)

                                        ATTORNEYS FOR DEFENDANT
                                        GARDA CL SOUTHWEST, INC.

## <u>CERTIFICATE OF SERVICE</u>

On the 17th day of March, 2014, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. District Court, for the Southern District of Texas, Houston Division, using the Electronic Case Files system of the Court. I hereby certify that I have served all counsel and/or pro se parties of record electronically and/or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Robert F. Friedman*
Robert F. Friedman

Firmwide:125960770.1 067762.1109