IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHRISTIAN VALLEJO, Individually and on behalf of all similarly situated current and former employees, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-12-0555 |
| GARDA CL SOUTHWEST, INC., | § § § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Jason Winn and Karlnetta Coleman worked as armored-car driver/messenger/guards for Garda CL Southwest (Garda) from 2003 to 2010 (Winn) and 2011 to 2012 (Coleman). Winn and Coleman transported coins, currency, checks, and other valuables between Garda's Houston facility and other locations around Houston. Routine stops included various commercial banks that receive checks, currency, and coins from the Houston Branch of the Federal Reserve Bank, and Automated Teller Machines (ATMs). Winn and Coleman, with others, sued Garda under the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201–19, seeking overtime pay under the Act, certification of a collective action, and damages for state-law claims. (Docket Entry Nos. 33, 63).

After discovery, Garda moved for summary judgment, (Docket Entry No. 71), arguing that the Motor Carrier Act exemption, 29 U.S.C. § 213(b)(1), which absolves certain employers from complying with the FLSA's overtime provisions, applies to armored-car driver/messenger/guards like the plaintiffs because they transport checks, currency, and coins in interstate commerce. The plaintiffs contend that they transported these items intrastate and did not have the interstate-

commerce connection the Motor Carrier Act requires.

The court heard oral argument on the motion and allowed the parties to supplement their submissions. Based on the pleadings, the motion, response, and the parties' submissions, the record, and the applicable law, the court grants Garda's motion for summary judgment on the plaintiffs' FLSA claims, declines to exercise jurisdiction over the remaining state-law claims, and denies the motion to certify a collective action as moot. A dismissal order is separately entered. The reasons are stated in detail below.

**I.     Background**

    **A.     Factual Background**

        **1.     Garda**

Garda is a contract carrier. It provides storage, processing, distribution, and transportation for currency, coins, checks, and other valuables for financial institutions and retailers. Garda and its armored-car drivers, who also serve as messengers and guards, are subject to the U.S. Department of Transportation (DOT) Federal Motor Carrier Safety Administration (FMCSA) requirements and regulations. Garda is responsible for verifying that its covered employees are authorized under the FMCSA to drive Garda's vehicles. Garda's driver/messenger/guards must operate, load, and unload Garda's armored vehicles according to the FMCSA safety standards.

Garda's driver/messenger/guards drive armored vehicles loaded with currency, coins, checks, and other valuables between Garda's local Houston facility and its customers' financial institutions, ATM locations, and retail establishments in Houston. The customers include the U.S. Federal Reserve Bank, Chase, IBC Bank, Wells Fargo, Bank of America, and PNC Bank. Garda's Houston facility often receives checks, currency, and coins delivered by its driver/messenger/guards from the

Houston Federal Reserve branch. Although Garda's drivers did not always pick up and deliver from the Federal Reserve, they could be called to do so on any given day. Any driver/messenger/guard could be assigned either the driver or messenger/guard role for any route or assignment on any given day, at Garda's discretion. Assignments were subject to change based on Garda's business needs.

Garda's Houston facility used armored vehicles for two types of routes, "Commercial Routes" and "ATM Routes." (Docket Entry No. 71-2, Ex. 1 ¶¶ 11-12, App. 3). On Commercial Routes, the driver/messenger/guards picked up currency, coin, and checks from customers' retail locations for deposit in financial institutions. The driver/messenger/guards then transported and delivered the currency, coin, and checks either directly to the designated financial institution or to Garda's Houston facility. Currency, coin, and checks received at Garda's Houston facility from the Commercial Route were then transported and delivered to the designated financial institution by Garda's driver/messenger/guards. On these Commercial Routes, driver/messenger/guards regularly, and at least weekly, transported hundreds of checks, including checks from banks outside of the State of Texas.

On the ATM Routes, the driver/messenger/guards transported the currency to be dispensed from ATMs to and from Garda's Houston facility and the ATMs. The driver/messenger/guards on the ATM route picked up deposits from ATMs, including currency and checks, before transporting and delivering these deposits to Garda's facility. From there, the currency and checks were delivered to, or picked up by, the designated financial institution. Driver/messenger/guards on these ATM Routes regularly and frequently—again, at least weekly— transported hundreds of checks, including checks from banks outside of the State of Texas.

    **2.**    **The Plaintiffs**

Winn and Coleman are the plaintiffs remaining in this action. Both worked as driver/messenger/guards at Garda. Both testified during their depositions that when they were working as messengers on a route, they were also acting as the "crew leader" or "crew chief." (*See, e.g.*, Docket Entry No. 71-2, Ex. 2, 40:24-25; Ex. 3, 161:19-22, App. 27, 115). Coleman testified that as crew leaders, "we were responsible for the route, most—we were both responsible for what happened on the route, but being the crew leader, you're—you're pretty much the one who says where we're going, how we're going to run the route, which way we're going to go next . . . ." (Docket Entry No. 71-2, Ex. 3 at 161:22-25, 162:1-3, App. 115-116). Winn testified that his job as the crew chief was to manage and run the route. (*Id.* 71-2, Ex. 2 at 79:11-20, App. 62).

Coleman testified in her deposition that she primarily served on ATM Routes. She testified that she commonly picked up hundreds of checks from Chase ATMs and delivered them to Chase banks. (*Id.* 71, Ex. 3 at 64:1-16, 68:1-3, App. 100-01). Winn testified in his deposition that he primarily worked on Commercial Routes. During the last five years of his employment, he picked up cash and checks every week from approximately 250 locations for transportation to, and deposit with, various financial institutions. (*Id.* 71-2, Ex. 2 at 75:11-23, App. 61). Neither plaintiff recalled picking up currency directly from the Federal Reserve, but both recognized the likelihood that the currency they transported had passed through the Federal Reserve. Coleman acknowledged in her deposition that the cash she loaded into her Garda vehicle and transported from Garda to ATMs on a daily basis came from the Federal Reserve. (*Id.*, Ex. 3 at 169:14-17, App. 118). She later clarified that she "assumed it came from the Federal Reserve." (*Id.*, Ex. 3 at 170:3-14, App. 119). Winn recalled seeing some "coins that might have gone to the Federal Reserve Bank" and delivering and picking up cash from Chase ATMs. (*Id.*, Ex. 2 at 52:13-17, 105:17-19, App. 39, 74). Garda's

branch manager testified that the cash delivered to Chase ATMs would include currency that Garda received "in its original and unopened packages from the Federal Reserve." (*Id.*, Ex. 1 ¶ 14, App. 3).

### B. Procedural Background

In February 2012, Christian Vallejo, another former Garda driver/messenger/guard, sued the company on behalf of himself and other similarly situated employees under the FLSA's overtime provision. He also asserted state-law claims. (Docket Entry Nos. 1 (Complaint), 16 (Amended Complaint)). On October 18, 2012, three other Garda employees—Artemio Caballero, Jason Winn, and Karlnetta Coleman—filed opt-in notices and also moved to intervene. (Docket Entry Nos. 19–21, 32). The court granted the plaintiffs' motion to intervene, granted Garda's motion to compel Vallejo to arbitrate under his collective-bargaining agreement, dismissed without prejudice the claims he had asserted in this lawsuit, and denied the motion to compel the intervenors to arbitrate. (Docket Entry Nos. 36, 45). Garda moved to stay the litigation of the intervenors' claims pending both the arbitration of Vallejo's claims and Garda's appeal from the decision denying the motion to compel the intervenors to arbitrate their claims. (Docket Entry No. 52). The court denied the motion. (Docket Entry No. 58). Garda appealed to the Fifth Circuit, which affirmed. (Docket Entry No. 87).

Meanwhile, on January 31, 2014, the intervenor-plaintiffs (Caballero, Coleman, and Winn) moved to certify a collective action. (Docket Entry No. 63). On March 17, 2014, Garda moved for summary judgment, asserting (among other things) the Motor Carrier Act's exemption to the FLSA.

(Docket Entry No. 71).[1]  On July 25, 2014, the remaining plaintiffs—Winn and Coleman—responded to Garda's motion for summary judgment. (Docket Entry No. 90). Garda replied, and the plaintiffs surreplied. (Docket Entry Nos. 91, 92, 95). The court heard argument on the motions, and Garda responded (with the court's permission) to the plaintiffs' surreply.[2]

## II. The Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record. . . ." Fed. R. Civ. P. 56(c)(1)(A). "[T]he plain language of Rule 56[ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[1] The court granted Garda's motion to dismiss Caballero's claims because he twice failed to appear at his own deposition or otherwise pursue his claim. (Docket Entry No. 74, 89).

[2] In their surreply, the plaintiffs asked for more discovery on the Motor Carrier Act exemption, arguing that the prior discovery had focused on whether to compel arbitration, and not the exemption. The plaintiffs did not raise this objection in their response to Garda's opening brief in support of its motion for summary judgment. Nor did they identify any restriction on their ability to obtain this discovery earlier or adequately explain why additional discovery would influence the outcome of Garda's summary judgment motion. *See* Fed. R. Civ. P. 56(d) (requiring the nonmovant opposing a motion for summary judgment to "show[] by affidavit or declaration, for specified reasons," that it "cannot present facts essential to justify its opposition" before the court may allow additional discovery); *McKay v. Novartis Pharmaceutical Corp.*, 751 F.3d 694, 700 (5th Cir. 2014) (requiring a nonmovant to have "diligently pursued discovery" and "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion"). The request for added discovery is both untimely and insufficient.

6

"Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex*, 477 U.S. at 323). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine dispute of material fact, it does not need to negate the elements of the nonmovant's case. *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Duffie*, 600 F.3d at 371 (internal quotation omitted).

"When the moving party has met its Rule 56[ ] burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Id.* "The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Id.* (quotations omitted). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). "In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party." *Duffie*, 600 F.3d at 371.

**II.     Analysis**

Garda argues that: (A) the plaintiffs' FLSA claims are barred by the Motor Carrier Act exemption; (B) Winn's FLSA claim is time-barred; (C) this court should either reject the plaintiffs' state-law claims on the merits or decline supplemental jurisdiction if the federal claims are dismissed; and (D) the plaintiffs' motion to certify a collective action should be dismissed as moot. Winn and Coleman argue that the exemption does not apply and that the statute of limitations does not bar Winn's FLSA claim.

**A.     The Motor Carrier Act Exemption**

The FLSA requires employers to pay employees at time-and-a-half for working more than forty hours in a work week. *See* 29 U.S.C. § 207(a). The FLSA exempts from this requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the Motor Carrier Act ("MCA"). *Id.* § 213(b)(1). The exemption eliminates potential conflicts between the Department of Labor's jurisdiction over the FLSA and the Department of Transportation's jurisdiction over the Motor Carrier Act. An example of potential conflict is the FLSA's requirement to pay overtime hours at one and one-half times the regular pay rate. Encouraging drivers to work overtime hours could undermine safety regulations limiting the number of continuous hours drivers may be on the road. *See Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009); *Levinson v. Spector Motor Serv.*, 330 U.S. 649 (1947).

Section 13501 of the Act gives the Secretary of Transportation jurisdiction over motor carriers and § 31502 authorizes the Department of Transportation to set qualifications and hours for employees of a motor carrier. 49 U.S.C. §§ 13501, 31502. The Motor Carrier Act exemption

applies to any employee for whom the Secretary has authority to regulate qualifications and maximum hours of service, regardless of whether the Secretary has exercised that authority. *See* 29 U.S.C. § 213(b)(1); *see also Levinson v. Spector Motor Serv.*, 330 U.S. 649, 678 (1947); *Barefoot v. Mid–America Dairymen, Inc.*, 16 F.3d 1216, *2 (5th Cir. 1994) (per curiam) (unpublished); *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 229 (2d Cir. 2002).

FLSA exemptions are construed narrowly and against the employer. *Barefoot*, 16 F.3d 1216, at *2; *see also Songer v. Dillon Resources, Inc.*, 618 F.3d 467, 471 (5th Cir. 2010). The employer has the burden to prove that the exemption applies. *Id.* For the Motor Carrier Act exemption to apply, the employee must: (1) be employed by a motor carrier subject to the Secretary of Transportation's jurisdiction; (2) be engaged in activities directly affecting motor vehicle safety; and (3) be engaged in activities involving the interstate transportation of goods. *See* 29 C.F.R. § 782.2.

### 1. Whether Garda Is a "Motor Carrier" Subject to the Secretary of Transportation's Jurisdiction

Garda argues that it is a motor carrier subject to the Secretary of Transportation's jurisdiction. Before August 2005, the Motor Carrier Act exemption applied to all drivers operating in interstate commerce, regardless of the weight of the vehicle driven. *See* 49 U.S.C. § 13102 (2002) ("motor carrier" as used in 49 U.S.C. § 31502(b) meant simply "a person providing motor vehicle transportation for compensation."). On August 10, 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA–LU"), which amended key definitions relating to the exemption. *See* Pub. L. No. 109–59, 199 Stat. 1144 (2005). "Motor carrier" was redefined as a "person who provides commercial motor vehicle transportation for compensation." 49 U.S.C. § 13102(14) (emphasis added). "Commercial motor vehicle" was

defined as "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle—(A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds whichever is greater." 49 U.S.C. § 31132(1).  On June 6, 2008, Congress restored the pre-SAFETEA-LU definition of "motor carrier" when it passed the SAFETEA–LU Technical Corrections Act of 2008, Pub.L. No. 110–244, §§ 305–06, 122 Stat. 1572, 1620–21 (2008).  Despite this language change, the Technical Corrections Act reconfirmed that the Motor Carrier Act exemption does not apply to drivers operating motor vehicles that weigh 10,000 pounds or less. *See* 110 P.L. 244, § 306; 122 Stat. 1572, 1620–21 (2008); *see also Brooks v. Halsted Comm'ns Ltd.*, 620 F.Supp.2d 193, 197–98 (D. Mass. 2009).

The undisputed summary judgment evidence shows that as a matter of law, Garda is a motor carrier under the Act.  Garda provides commercial motor vehicle transportation for compensation, as required under 49 U.S.C. § 13102(14).  Although the plaintiffs contend that they were not engaged in interstate commerce in their work because their deliveries and routes were intrastate, Garda itself clearly operates in interstate commerce.  It is a contract carrier under the jurisdiction of the  Department of Transportation Services.  *See Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 (11th Cir. 1991) (per curiam) (observing that a "contract carrier" is "subject to the Secretary's jurisdiction under the Motor Carrier Act"); *see also Jaramillo v. Garda, Inc.*, No. 12-C-662, 2012 WL 4955932, at *1 (N.D. Ill. Oct. 17, 2012) (granting summary judgment on Motor Carrier Act exemption and finding that Garda CL Great Lakes, Inc., was a motor carrier covered by the Act).  Finally, Garda has submitted undisputed evidence showing that its armored trucks—including the three types of trucks the plaintiffs drove—each weigh more than 10,001 pounds, as required under § 31132(1).  (Docket Entry No. 71-2, Ex. 1 ¶ 6 & Exs. A, B, C)  (App.

2, 5-7).

The undisputed evidence in the summary judgment record shows that Garda provides motor vehicle transportation for compensation and operates in interstate commerce, and that the plaintiffs operated vehicles weighing more than 10,000 pounds. Garda qualifies as a motor carrier subject to the jurisdiction of the Secretary of Transportation.

### 2. Whether the Plaintiffs Engaged in Activities Affecting the Safety of Motor Vehicles

Garda argues that the plaintiffs engaged in activities affecting the safety of motor vehicles. A "driver" is an occupation that directly affects the safety of motor vehicles. *See* 29 C.F.R. § 782.2(b)(1). Drivers fall under the Motor Carrier Act exemption if they "drive[ ] a motor vehicle in transportation which is, within the meaning of the Motor Carrier Act, in interstate or foreign commerce." 29 C.F.R. § 782.3(a). A driver's helper "is an employee other than a driver, who is required to ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.4(a). The regulation (to which this court owes deference) specifically includes "armed guards on armored trucks" as an example of a covered driver's helper. *Id.* As a result, courts have concluded that the Motor Carrier Act applies to driver/messenger/guards performing the same kind of work as the plaintiffs. *See Baez*, 938 F.2d at 182 (observing that "'guards on armored bank trucks . . . performed services which affect the safety of the vehicle'" (quoting *Opelika Royal Crown Bottling Co. v. Goldberg*, 299 F.2d 37, 43 (5th Cir. 1962)).

Winn and Coleman each testified to driving or riding in the armored vehicles for a substantial portion of their employment at Garda. The undisputed facts show that as a matter of law, both were engaged in activities affecting the safety of motor vehicles.

### 3. Whether the Plaintiffs' Activities Involved Interstate Commerce

The final question is whether the plaintiffs' activities involved interstate commerce. For the purpose of the Motor Carrier Act exemption, "[a] carrier engages in interstate commerce by either actually transporting goods across state lines or transporting within a single state goods that are in the flow of interstate commerce." *Barefoot*, 16 F.3d 1216, at *2 (citing *Merchants Fast Motor Lines, Inc. v. I.C.C.*, 528 F.2d 1042, 1044 (5th Cir. 1976)); *see also* 29 C.F.R. § 782.7(b)(1) ("Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce. Employees of a carrier so engaged, whose duties directly affect the safety of operation of such vehicles, are within the exemption in accordance with principles previously stated. The result is no different where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce." (citations omitted)).

The parties agree that Winn and Coleman transported items between two points within the State of Texas. Transportation within a state can be interstate in nature and subject to the Secretary of Transportation's jurisdiction if the transportation is part of a "practical continuity of movement" of goods bound for destinations beyond the state. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943); *Merchants Fast Motor Lines*, 528 F.2d at 1044; *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 944 (5th Cir. 1969); *Shew v. Southland Corp. (Cabell's Dairy Division)*, 370 F.2d 376, 380 (5th Cir. 1966) (stating that the transport of goods originating out of state remains interstate if the interstate and intrastate legs of the journey form a continuous movement).

Once goods enter into "the channels of interstate commerce," a stop in the movement of the goods does not necessarily mean they are no longer in interstate commerce. *Jacksonville Paper Co.*,

317 U.S. at 568. If the stop represents "a convenient intermediate step in the process of getting them to their final destinations, [the goods] remain 'in commerce' until they reach those points." *Id.* Goods picked up and delivered intrastate are considered to be in interstate commerce if they originated out of state and the intrastate part of the route is the final phase of an unmistakably interstate transport. *See Siller v. L & F Distributors, Ltd.*, 109 F.3d 765, *2 (5th Cir. Feb. 18, 1997) (per curiam) (unpublished) (stating that "placing goods in a warehouse interrupts, but does not necessarily terminate the goods' interstate journey"); *Barefoot*, 16 F.3d 1216, *3 (holding that the halt of shipments of unprocessed milk, without processing or commingling, did not remove the interstate character of the shipments); *Merchants Fast Motor Lines*, 5 F.3d at 917 (holding that local delivery drivers operate in interstate commerce when they drive vehicles loaded with goods that were shipped to Texas from another state, temporarily stored at a warehouse in Texas, then delivered to a Texas customer via local delivery drivers); *Galbreath*, 413 F.2d at 942, 947 (holding that the Motor Carrier Act exemption applied to drivers who performed solely intrastate transportation of petroleum products that originated out of the state); *Shew*, 370 F.2d at 380-81 (holding that dairy products that originated outside of Texas and shipped to Texas, then stopped in Dallas, were part of a continuous movement in interstate commerce; the truck drivers who delivered the products locally in Texas were engaged in interstate commerce for purpose of the Motor Carrier Act exemption); *Opelika*, 299 F.2d 37, at *40-41 (holding that the intrastate transport of empty bottles destined for a bottling plant outside the state was a part of interstate commerce); *Glanville v. Dupar, Inc.*, No. H-08-2537, 2009 WL 3255292, at *9–10 (S.D. Tex. Sept. 25, 2009) (holding that the time appliances were at a distribution center within the state did not break the continuity of interstate movement; the subsequent delivery from the distribution center was the last phase in the interstate

13

shipment).

The Eleventh Circuit has specifically addressed the interstate character of deliveries made by armored trucks. In *Baez v. Wells Fargo Armored Service Corp*, 938 F.2d 180 (11th Cir. 1991), the issue was whether drivers operating armored trucks loaded with coins, currency, checks, mails, and other items of value within Florida were subject to the Motor Carrier Act exemption. *Id.* at 181. The armored trucks transported the items to and from service banks and commercial establishments, including the Federal Reserve Bank, the United States Postal Service, and United Parcel Service. *Id.* The checks and other instruments the trucks carrier were destined for banks outside of the state. *Id.* at 182. The court concluded that because the armored trucks transported checks and other instruments destined for banks outside Florida, the armored-truck drivers were engaged in interstate commerce. *Id.*; *see also Hernandez v. Brink's, Inc.*, No. 08-20717-CIV, 2009 WL 113406 (S.D. Fla. Jan. 15, 2009) (concluding that "checks and other property destined for interstate or foreign destinations" fell "squarely within the meaning of interstate commerce" under the Motor Carrier Act). The court relied on *Opelika*, 299 F.2d 37, a Fifth Circuit case holding that the intrastate transport of empty bottles bound for another state was in interstate commerce.

Winn and Coleman's transportation activities involved interstate commerce in at least two ways. First, they transported, or could have been called on to transport, currency and coins from the Federal Reserve in Houston to Houston locations. According to Hammond's declaration, over twenty-five percent of the coins Garda transported from the Houston Federal Reserve were freshly minted[3]—that is, had "not yet been in circulation"—and originated from a U.S. Mint facility outside

---

[3] The plaintiffs dispute the "freshly minted" characterization, (Docket Entry No. 90, at 9), but they neither identify nor submit any controverting summary judgment evidence. Their unsworn conclusory assertions are insufficient to raise a material factual dispute.

Texas. (Docket Entry No. 71-2, Ex. 1 ¶ 8, App. 2). While Winn and Coleman did not recall picking up currency and coins directly from the Federal Reserve, they acknowledged making pick-ups and deliveries at ATMs and banks that Hammond testified used currency and coins from the Federal Reserve. In either scenario, they "'could reasonably have been expected to [engage] in interstate commerce consistent with their job duties.'" *Allen v. Coil Tubing Servs., LLC*, 755 F.3d 279, 284 (5th Cir. 2014) (quoting and altering *Songer*, 618 F.3d at 476).

Winn and Coleman contend that the coins and currency are "processed" at the Garda facility and, as a result, the transport loses its interstate character. The evidence shows that Garda armored trucks "pick up the currency and coin from the Federal Reserve," both directly and indirectly, and "transport the currency and coin to the Houston [Garda] Branch for delivery to its customers." (Docket Entry No. 71-2. Ex. 1 ¶ 7, App. 2). The undisputed record evidence shows that the processing that the plaintiffs alleged occurred at the Garda facility happened *after* the driver/messenger/guards transported the currency and coins from the Federal Reserve in Houston (or commercial banks using the Federal Reserve currency and coins) to the Garda facility. Even if the processing broke the continuity of movement in interstate commerce, as the plaintiffs alleged, the Garda trucks were engaging in interstate commerce up to the point of processing and the plaintiffs "'could reasonably have been expected to [engage] in interstate commerce consistent with their job duties.'" *Allen*, 755 F.3d at 284 (quoting and altering *Songer*, 618 F.3d at 476).

Second, the plaintiffs transported, or could reasonably be called on to transport, checks drawn on out-of-state banks. The plaintiffs transported the checks between Garda's commercial customers and either the Houston Garda facility or a financial institution. The plaintiffs also transported the checks between ATMs and the Houston Garda facility. (Docket Entry No. 71-2, Ex.

1 ¶¶ 11–13, App. 3). Garda submitted a sworn declaration from one of its managers attesting to the fact that some of these checks were destined for banks outside of the State of Texas. (*Id.*). The plaintiffs do not point to or submit any evidence on this subject. Instead, they argue that the out-of-state checks made up only a small part of the plaintiffs' armored vehicle deliveries and were a *de minimus* part of the plaintiffs' work. The support for this assertion is that it is an "electronic funds transfer (Walmart, smartphone deposit, and physical checks returned after ETF) and 'no out of state checks accepted' world." (Docket Entry No. 90 at 10). As Garda notes, however, the first argument is not supported by precedent and the second does not cite or rest on any summary judgment evidence. (Docket Entry No. 91 at 4). And the character of the activities, not the percentage of the work day they occupy, is the important factor. *See Barefoot*, 16 F.3d at *3 ("[I]t is the '*character* of the activities, rather than the *proportion* of the employee's time or of his activities' that determines jurisdiction under the MCA.") (quoting *Morris*, 332 U.S. at 431) (emphasis added).[4]

Materials from the Department of Labor support Garda's position. The Department's Field Operations Handbook, published in 1999, states:

> In the usual operation of an armored car company the vehicles transport checks drawn on out-of-State banks as well as coins and currency to a bank for subsequent out-of-State transmittal. The transportation to the main bank for further transmittal is part of a "practical continuity of movement" across State lines, making the Sec 13(b)(1) exemption applicable.

(Docket Entry No. 71-2, Ex. 5, App. 135). A Department of Labor opinion letter from 1997 is

---

[4] Even accepting the plaintiffs' "electronic funds transfer" argument, it is unclear why their intrastate transportation of checks — the armored-vehicle shipments within Houston — to allow the checks to be electronically sent through another "channel" of interstate commerce to banks in other states would not qualify as part of the "practical continuity of movement" across state lines in contemporary society.

consistent:

> In construing the extent of the Section 13(b)(1) exemption, the courts have ruled that employees do not have to cross a state line to be subject to the exemption if they are transporting property destined for another state. Such property may consist of checks drawn on out-of-state banks transported by employees of an armored car company who do not drive across a state line.

(*Id.*, Ex. 6, App. 138).

The plaintiffs argue that the checks, like the coins, were "processed beyond repackaging" at Garda's Houston facility, stopping their interstate character. The plaintiffs argue that this processing occurred when the checks were "encoded, scanned, and consolidated." (Docket Entry No. 90 at 8-9). This argument ignores Hammond's sworn testimony about how Garda processed checks retrieved from ATMs. The checks were picked up at the ATMS; separated from the cash; transported to Garda's Houston facility; consolidated; and held; then given to the courier serving the specific bank on which the checks were drawn. (*Id.*, Ex. 3 at 97:23–25, 99:1–8). Hammond testified that when Garda vehicles picked up checks from bank branches to be processed, the checks were taken to Garda's Houston facility, "encoded in order for the transfer between the financial institutions to take place," scanned, and the image sent to the financial institution on which the check was drawn. (*Id.*, Ex. 3 at 102:8–16). Apart from unsworn conclusory assertions, the plaintiffs have not controverted this evidence.[5]

The undisputed evidence and the clear law lead to the conclusion that the regular course of

---

[5] Indeed, Coleman's sworn affidavit, attached to the plaintiffs' surreply, confirms Hammond's account. (Docket Entry No. 92-2, Ex. B). Coleman's affidavit describes a process that mirrors the one Hammond offers. (*Id.*, Ex. B ¶ 5). She also acknowledges that "[t]he Federal Reserve money, cash and coin was collected from retailers and financial institutions in Houston and the surrounding area." (*Id.*, Ex. B ¶ 4).

17

the plaintiffs' duties as driver/messenger/guards working at Garda's Houston facility was to engage in transportation that was part of the practical continuity of movement across state lines. Based on the undisputed record evidence, this court concludes as a matter of law that the plaintiffs' maximum hours of service were subject to regulation by the Secretary of Transportation under the Motor Carrier Act. The Motor Carrier Act exemption from the FLSA applies. Because the plaintiffs were exempt from the FLSA, they were not entitled to unpaid overtime compensation. The court grants Garda's motion for summary judgment dismissing the FLSA claims.[6]

### C.    The Remaining State-Law Claims

A district court "'shall' have supplemental jurisdiction over claims 'so related to' claims within the court's original jurisdiction." *Certain Underwriters at Lloyd's v. Warrantech Corp.*, 461 F.3d 568, 578 (5th Cir. 2006) (quoting 28 U.S.C. § 1367(a)). "Yet § 1367(a)'s command is

---

[6] Garda also moved for summary judgment dismissing Winn's FLSA claim on the basis of limitations. The record shows that apart from the Motor Carrier Act exemption, Winn's FLSA claims are time-barred. The FLSA's two-year limitations period applies unless the violation is willful. The statute provides:

> [E]very such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C. § 255(a). "[T]he filing of the motion for intervention, and not the later approval of the motion and actual filing of the complaint, determines the commencement of the action for purposes of the statute of limitations." *U.S. for Use and Benefit of Canion v. Randall & Blake*, 817 F.2d 1188, 1192 (5th Cir. 1987).

Winn moved to intervene in this action on October 18, 2012, more than two years after his employment with Garda ended on September 14, 2010. Winn's own complaint does not allege willful violations; only Vallejo's original complaint does. Even allowing Winn to incorporate Vallejo's willfulness allegations by reference, the record does not support finding willfulness, and Winn fails to identify or submit evidence supporting such a finding. To raise a factual dispute as to willfulness, a plaintiff must point to evidence that the employer "either knew or showed reckless disregard as to whether its conduct was prohibited by the Act." *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990). Winn's conclusory assertions do not suffice to defeat summary judgment. (Docket Entry No. 90, at 12-13). Winn's FLSA claim is time-barred and summary judgment is appropriate on this ground as well.

18

moderated by the factors provided in 28 U.S.C. § 1367(c), which allow a district court to decline supplemental jurisdiction under certain circumstances." *Id.* One such circumstance arises when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Having dismissed the only federal claims in this case, the issue is whether to decline to exercise supplemental jurisdiction over the remaining state-law claims for fraud, fraudulent inducement, fraud by nondisclosure, negligence, negligent misrepresentation, and negligent hiring. The Fifth Circuit follows the "'general rule' that courts should decline supplemental jurisdiction when all federal claims are dismissed or otherwise eliminated from a case." *Lloyd's*, 461 F.3d at 578. This case has been on file for an extended period, but the focus has been on threshold issues wholly unrelated to the plaintiffs' state-law claims. Judicial efficiency, fairness to the parties, and comity all support allowing the remaining state-law claims to be resolved in state court. This court declines to exercise supplemental jurisdiction over the remaining state-law claims and dismisses them without prejudice so that the plaintiffs may file in state court if they wish. *See* 28 U.S.C. § 1367(d).

### D.     The Plaintiffs' Motion to Certify a Collective Action

In light of the court's ruling dismissing the plaintiffs' FLSA claims under the Motor Carrier Act exemption, the court concludes that the plaintiffs' motion to certify a collective action, (Docket Entry No. 63), is moot. *See Wright v. Shock*, 742 F.2d 541, 544 (9th Cir. 1984) ("It is reasonable to consider a Rule 56 motion first when early resolution of a motion for summary judgment seems likely to protect both the parties and the court from needless and costly further litigation."); *Glanville v. Dupar, Inc.*, No. H-08-2537, 2009 WL 3255292, at *1 (S.D. Tex. Sept. 25, 2009) ("The

undisputed facts in the record show, as a matter of law, that the motor carrier exemption applies and that the plaintiffs are not entitled to overtime compensation under the FLSA. The plaintiffs' motion for class certification is denied as moot.").

## VI. Conclusion

Garda's motion for summary judgment (Docket Entry No. 71) on plaintiffs' FLSA claims is granted. The plaintiffs' motion to certify a collective action (Docket Entry No. 63) is denied as moot, and the plaintiffs' remaining state-law claims are dismissed without prejudice. This order, with those previously entered, resolves the claims in this court. This action is dismissed, and an order of dismissal is entered by separate order.

SIGNED on September 29, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge